727 P.2d 789 (1986)
S.J., Appellant,
v.
L.T., Appellee.
No. S-889.
Supreme Court of Alaska.
November 7, 1986.
*791 J. John Franich, Office of Public Advocacy, Fairbanks, for appellant.
Andy Harrington, Alaska Legal Services Corp., Fairbanks, for appellee.
Edward T. Noonan, Fairbanks, as guardian ad litem.
Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

OPINION
COMPTON, Justice.
This is an appeal from a superior court order terminating the parental rights of a biological father (S.J.) on public policy grounds, specifically that the child (S.J., Jr.) had been conceived during an "illegal relationship." S.J. was convicted in an unrelated criminal proceeding of first degree sexual assault against L.T., the mother of the child. S.J. challenges this termination on three grounds: (1) the Superior Court of Alaska lacks subject matter jurisdiction; (2) the superior court lacks the power to terminate parental rights in the absence of either an adoption or child in need of aid proceeding; and (3) it was error to hold that a father of a child conceived during an allegedly criminal relationship should be denied visitation and other parental rights. We affirm in part, reverse in part and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND
S.J. began living with L.T. and her mother when L.T. was eight years old. He later married L.T.'s mother, although the marriage was apparently not legal. L.T. claims that S.J. began to abuse her sexually when she was eight years old, and that she was first forced to have intercourse with S.J. when she was twelve years old. She testified that S.J. forced her to have sex with other adults, took nude pictures of her, coerced her to have oral sex and beat her with a studded belt if she refused. S.J. denies most of L.T.'s allegations concerning sexual abuse, although he does admit to first having intercourse with L.T. when she was fourteen years old.[1]
S.J., Jr., L.T.'s second child, was born along the Ohio/Kentucky border in 1979 and spent a substantial amount of time during the first months of his life in the care of relatives. L.T.'s mother and L.T.'s husband no longer lived with L.T. and S.J., so "the family" consisted of S.J., L.T., and L.T.'s two small children, S.T. and S.J., Jr. When S.J., Jr. was one year old and L.T. was 16, the parties apparently planned to separate and a custody agreement was signed in Kentucky. In the agreement L.T. admitted that S.J. is the natural father of S.J., Jr. and that the parties had lived together for two years as "man and wife," and agreed to give S.J. permanent care and custody of S.J., Jr.
S.J., Jr.'s first and only contact with the State of Alaska, prior to this custody case, was during a four month period in 1981. S.J. brought "the family" to Alaska and obtained housing in Fairbanks claiming that he was married to L.T. and that the two children were theirs. S.J. left Alaska in August 1981 with S.J., Jr. After a short stay in Florida, S.J., Jr. lived with relatives and friends in Ohio and Kentucky while his father worked briefly in Louisiana before spending six months in jail in Ohio for probation violations.
In June 1982, L.T. filed a complaint for custody of S.J., Jr. in Superior Court for the State of Alaska, predicating jurisdiction on AS 25.30.020, a part of the Uniform Child Custody Jurisdiction Act (UCCJA). *792 In July, Judge Hodges ordered that L.T. have temporary custody of S.J., Jr. pending further order of the court.
Later that summer, a criminal indictment was issued for S.J. in Alaska based on incidents of alleged sexual abuse against L.T. occurring during the four months S.J. spent in Alaska with L.T. in 1981. S.J. was brought to Alaska for criminal trial. In September 1982 the court reaffirmed the temporary custody order, denied S.J.'s motion to dismiss, and ordered that the civil custody suit be held in abeyance pending resolution of the criminal matter, except that L.T. was allowed to continue her efforts to get the Alaska temporary custody order enforced in Kentucky. In October L.T. obtained a Kentucky order enforcing her Alaska temporary custody and she brought S.J., Jr. back to Alaska. L.T. later filed an Amended Complaint seeking permanent custody of the child and termination of the parental rights of S.J.
In the criminal trial, S.J. was convicted by a jury of sexual assault in the first degree under AS 11.41.410(a)(1). The trial court sentenced him to twenty years in prison with ten years suspended. The conviction and sentence were upheld by the court of appeals. Judge Hodges ordered a single interim visit between S.J. and S.J., Jr. at the Fairbanks correctional center before he rendered his final decision in the custody case. This visit was successful and the child seemed to enjoy and have some bond with his father.
Thereafter, L.T. left the state with S.J., Jr., S.T. and her new husband. In early 1985 Judge Hodges filed his findings of fact and conclusions of law in which he terminated S.J.'s parental rights on public policy grounds because S.J. "father[ed] a child by means of a criminal relationship." S.J. appeals.

DISCUSSION

I. JURISDICTION
S.J. claims that the superior court does not have subject matter jurisdiction over this custody action under the UCCJA. He claims that Kentucky was S.J., Jr.'s home state for the six months preceding the filing of the custody action and thus Kentucky was the state that properly had jurisdiction under the UCCJA. L.T. claims that Alaska properly assumed jurisdiction under AS 25.30.020(a)(3) because no other state had jurisdiction under UCCJA sections similar to AS 25.30.020(a)(1) or (2) and it was in the best interests of the child to have Alaska decide the custody issue.[2] The Commissioners' Note to this section of the UCCJA states that it "provides a final basis for jurisdiction which is subsidiary in nature. It is to be resorted to only if no other state could, or would, assume jurisdiction under the other criteria of this section." UCCJA § 3, 9 U.L.A. 124 (1979).
In determining whether a court has jurisdiction over a custody dispute under the UCCJA, this court has held that "subject matter jurisdiction either exists or does not exist at the time when the petition is filed with the court." Rexford v. Rexford, 631 P.2d 475, 478 (Alaska 1980).

*793 A. Did S.J., Jr. Have a "Home State" When this Custody Case was Filed?
It is undisputed that S.J., Jr. was not in Alaska during any of the six months immediately preceding the filing of the custody action by his mother. Alaska was not the child's "home state"[3] as used in AS 25.30.020(a)(1) and (2), thus we must look to AS 25.30.020(3) as the only possible basis for finding jurisdiction in Alaska. For jurisdiction to be predicated on subsection (3), a two-part test must be met: (1) there must be no other state that is the child's "home state", the child is not a "child in need of aid" in the state in which s/he is physically present, or another state must have declined jurisdiction in favor of Alaska, and (2) it must be in the best interest of the child that Alaska decide the custody case.
S.J. claims that Kentucky is the state that properly has jurisdiction in this custody action because S.J., Jr. lived in Kentucky with his paternal grandparents for the six months immediately preceding "the time involved." L.T. states that during the six months prior to the filing of this action (January 21  June 21, 1982) S.J., Jr. was bounced back and forth between relatives and between states (S.J., Jr. lived on the Ohio/Kentucky border during this entire time) and thus he had no home state.[4]
The evidence shows that S.J., Jr. primarily resided with S.J.'s mother in Maysville, Kentucky during the six months prior to the filing of this case but that he also stayed with a minister and his wife for two weeks, with S.J.'s sister, and with a woman in Ohio named Lois when S.J.'s mother was working. From the evidence it is impossible to tell if S.J., Jr. lived in Kentucky consistently enough for it to be his "home state." However, there is more to the definition of "home state" than whether the child has spent six consecutive months in the state prior to the filing of the custody case.
L.T. argues that Kentucky could not be S.J., Jr.'s "home state" because the child was not in the care of a "person acting as a parent" as required by the definition of "home state".[5] "[P]erson acting as a parent" is a term of art defined in AS 25.30.900(9) as "a person, other than a parent, who has physical custody of a child and who has either been awarded custody by a court or claims a right to custody." L.T. argues that none of the people caring for S.J., Jr. during this period were awarded custody nor were they claiming a right to custody.
S.J. was in jail during much of the relevant six months prior to the filing of this case in Alaska. The various caretakers of S.J., Jr. were not asserting a right to custody. Thus, it does not matter if S.J. was kept in Kentucky consistently enough, because he was not living with a "person acting as a parent" as required by the "home state" definition in the UCCJA. Therefore, S.J., Jr. has no "home state" under the UCCJA.[6]

B. Can Alaska Properly Accept Jurisdiction Under the UCCJA?
Having concluded that S.J., Jr. has no "home state" (and there is no contention *794 that S.J., Jr. was a "child in need of aid" or its equivalent in Kentucky), then Alaska has jurisdiction if it is in the best interests of the child that this state decide the custody case. AS 25.30.020(a)(3). "Best interests" is nowhere defined.
In Rexford v. Rexford, 631 P.2d 475 (Alaska 1980), this court had the opportunity to scrutinize the jurisdiction sections of the UCCJA here at issue. In that case, the wife filed a custody action in California, eight days after she had left Alaska with her nine and seven year old children, who had lived in Alaska all of their lives. The husband filed a divorce and custody action in Alaska. The superior court ordered a stay of the custody proceeding in Alaska under AS 25.30.050 because a custody proceeding was pending in a court of another state. The husband appealed from this order. Id. at 476-77.
We held that the Los Angeles Superior Court did not exercise jurisdiction substantially in conformity with the UCCJA, but that the Alaska Superior Court did not abuse its discretion in deferring to California and staying the Alaska proceeding even though the California court did not have jurisdiction. Id. at 479. We went on to quote from the Commissioners' Note on the subsection on which AS 25.30.050 is based, stating that:
While jurisdiction need not be yielded under subsection (a) [AS 25.30.050 in this state] if the other court would not have jurisdiction under the criteria of this Act, the policy against simultaneous custody proceedings is so strong that it might in a particular situation be appropriate to leave the case to the other court even under such circumstances.
Id. at 479, quoting Commissioners' Note to § 6, 9 U.L.A. 135 (1979). The key to our decision was that California had conducted extensive investigations in the case and that it "has available to it the fullest amount of information possible to make a fair and just determination of the custody issue." Id. at 479.[7]
In this case, Alaska has sufficient information available to it to make a fair determination of the custody issue. The superior court has available to it psychological reports on both the parents, one parent is incarcerated in this state, and the most recent visit between S.J. and S.J., Jr. occurred in this state. After three years of proceedings, reports, and investigations, it can only be said that it is in the best interests of the child that the case be decided by a well-informed court. We therefore conclude that the trial court did not err in determining it to be in the best interests of the child that this state decide the issue and thus the jurisdictional requirements of the UCCJA are met in this case. If these reasons are sufficient to justify deferring to a court which does not have jurisdiction, they are likewise sufficient to sustain a "best interests" determination under AS 25.30.020(a)(3).
Since the legislature did not see fit to circumscribe best interests determinations by defining the term, we believe the determination is best left to the trial courts, after considering all factors present in a particular controversy, subject to an abuse of discretion standard.

II. TERMINATION OF PARENTAL RIGHTS

A. Termination on Public Policy Grounds.
The trial court concluded that "as a matter of public policy, a party who fathers a *795 child by means of a criminal relationship should not be permitted to have rights of visitation and other parental rights, and that defendant's parental rights should be terminated based solely on this public policy." We disagree.
First, it is not clear from the record that S.J., Jr. was conceived as a result of a criminal relationship. S.J. was convicted under Alaska law for sexual assault of L.T. which occurred in Alaska well after S.J., Jr. was born. It appears that S.J., Jr. was conceived in Kentucky, although there is some ambiguity about this in the record. Whether his conception was the result of a criminal act must be determined by the law of the place where the act occurred. Nothing in the record indicates that the trial court considered Kentucky law on the subject of sexual assault, sexual abuse of a minor or incest. Nor did the court address the legal effect under Kentucky law of L.T.'s emancipation by her previous marriage. The evidence in the record is insufficient to support a finding that S.J., Jr. was conceived as a result of a criminal relationship.
Second, there are serious problems with using a "criminal relationship" as a basis for termination. Consider the case of a child conceived during an on-going consensual sexual relationship of an eighteen year old boy and a fifteen year old girl. The boy's conduct is considered a felony, see AS 11.41.438, yet it is far from clear whether his parental rights should be terminated if a child is conceived.
Similarly, if a child is conceived as a result of an act of prostitution, both parties are presumably guilty of a misdemeanor. See AS 11.66.100. However, it would not necessarily be appropriate to terminate the parental rights of either party; terminating the rights of both is a most troubling possibility.
These examples demonstrate the extremely difficult and sensitive decisions that must be made when criminal law and family law overlap. We feel that these decisions are better left to the legislature. The legislature's special province is the gathering of information from concerned citizens and experts regarding issues of public policy. It has the necessary resources to research fully sensitive issues such as this one. Matter of C.D.M., 627 P.2d 607, 615 (Alaska 1981) (Matthews, J., dissenting).
We hold that the trial court erred in terminating S.J.'s parental rights on public policy grounds. Involuntary termination of parental rights may not be accomplished absent some statutorily mandated procedure.[8] We next address whether any such procedure supports the termination in this case.

B. Statutory Termination Procedures.
Only two statutory mechanisms provide for the involuntary termination of parental rights, adoption or a child in need of aid proceeding.[9] S.J. argues that neither of these procedures was invoked in the lower court so as to allow the termination of his rights. L.T. argues that this custody case is "in connection with an adoption proceeding" under AS 25.23.180(e)[10] and thus the court had the power to terminate S.J.'s parental rights. She also argues that it is not necessary for an adoption proceeding to be filed prior to a petition for termination.
This is a question of statutory interpretation that has not been decided in Alaska previously. AS 25.23.180(a) provides "[t]hat rights of a parent ... may be relinquished and the relationship of parent and *796 child terminated in or before an adoption proceeding as provided in this section."[11] L.T. argues that this section supports her claim that S.J.'s parental rights can be involuntarily terminated before an adoption action is filed. She states that when this custody case was brought it was not clear whether her male friend (now her husband) would be marrying her and adopting her children. Thus she claims it was permissible to bring a termination action prior to an adoption proceeding. However, although L.T. has married the man, he has not filed an adoption action.
We do not believe that parental rights can be terminated before an adoption action in this case, although it obviously is permissible in some cases. The language in AS 25.23.180(a) stating that termination can occur "before an adoption proceeding" must be read in conjunction with the "relinquishment" language of AS 25.23.180(b). That section does not contemplate involuntary termination actions, but rather refers to cases in which parents choose to give up their parental rights. Moreover the language in AS 25.23.180(e), upon which both parties rely, clearly requires that a termination petition be connected with an adoption case. This case is not so connected.[12]
The guardian ad litem stresses that the right to have and raise a family, and the right to family integrity is generally recognized as a "fundamental right" protected from state infringement by the Fourteenth Amendment. Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). This court has stated that
the fundamental nature of parental rights requires strict construction of adoption statutes ... [P]arents should not be deprived of the fundamental rights and duties inherent in the parent-child relationship except for "grave and weighty reasons."
Matter of Adoption of K.M.M., 611 P.2d 84, 87 (Alaska 1980) (Citations omitted). This mandate would be violated if we were to hold that this child custody case is "in connection with an adoption" based solely on the fact that the possibility of adoption by L.T.'s new husband was brought up during hearings.
L.T. further claims that the comments to section 19 of the Uniform Adoption Act (on *797 which AS 25.23.180 is based) make it clear that the drafters "contemplated private termination actions." Although this may be true, there is no indication that the drafters contemplated such actions separate from an adoption proceeding. The one case interpreting this section of the Uniform Act in light of our problem is Kottsick v. Carlson, 241 N.W.2d 842 (N.D. 1976). There, the North Dakota Supreme Court, without explanation or authority stated: "[i]n sequence, the termination question should be resolved first, and the adoption thereafter. But this does not mean two separate proceedings." Id. at 853. On its face, the statement does not mandate a particular reading of the statute, but it implies that the termination question should be determined in the confines of an adoption proceeding.
L.T. also relies on the case of Huey v. Lente, 85 N.M. 597, 514 P.2d 1093 (1973), from a state which adopted the Uniform Adoption Act, and on two cases from states which have not adopted the Act, to support her conclusion that private terminations are permitted before adoption actions. However, the New Mexico statute relied on in Huey v. Lente is much broader than AS 25.23.180. Further, in the two non-Uniform Act cases, In re Johnson, 415 N.E.2d 108 (Ind. App. 1981) and Lutheran Social Services of New Jersey v. Doe, 172 N.J. Super. 343, 411 A.2d 1183 (1979), the courts allowed the termination of parental rights before an adoption action was filed, but only because those states, unlike Alaska, have statutes that allow such action to be taken.
In Alaska parental rights may be involuntarily terminated only in the context of an adoption or child in need of aid proceeding under AS 47.10. Since neither of these routes was followed, the termination was improper.[13]
AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this opinion.
BURKE, Justice, dissenting.
I respectfully dissent. The majority implicitly relies on the assumption that S.J. was born out of a consensual relationship between L.T. and S.J. If the child was not a product of a consensual relationship, S.J.'s alleged parental rights never attached and, hence, the termination of those "rights" is not an issue. The real issue, therefore, is whether L.T. consented to the act of intercourse with S.J. at the time the child was conceived.
L.T. testified, in both the criminal proceeding, in which S.J. was convicted of sexual assault and in the custody proceeding, that S.J. began abusing her sexually when she was eight years old, while S.J. was living with L.T.'s mother.[1] The trial court in the criminal proceeding admitted evidence relating to S.J.'s treatment of L.T. from age eight until the move to Alaska, in April 1981 when L.T. was sixteen years old. The court of appeals affirmed the admission of such evidence, relying on this court's decision in Burke v. State, 624 P.2d 1240, 1250 (Alaska 1980) (evidence of prior sexual acts with the same victim may be admissible to prove elements of a sexual assault case). The court of appeals explicitly held that such evidence was more probative than prejudicial, because S.J.'s prior acts were all "allegedly the same as the *798 present charge, non-consensual intercourse. The offenses which the state seeks to admit are not merely isolated incidents from [L.T.'s] childhood, but form a continuum starting when [L.T.] was eight years old." Jones v. State, MO & J No. 569 at 14 (Alaska App. April 18, 1984).
Despite L.T.'s testimony that there was no violent physical force, the jury convicted S.J. of sexual assault. AS 11.41.410(a)(1).[2] L.T. testified that she acquiesced to continued intercourse because of threats and abuse beginning when she was twelve years old. MO&J at 7-8.
At the custody proceeding L.T. again testified to the abuse which began when she was eight years old. Among other incidents, she testified that S.J. forced her to have sex with other adults, took pictures of her nude, and coerced her to engage in oral sex. She first had intercourse with S.J. at age 12, on a trip to Alaska. She also testified that S.J. convinced her to marry a serviceman, R.T., to legitimize the child she was carrying, which had been fathered by S.J. She was thirteen when this child was born. Shortly thereafter, L.T.'s mother reported S.J. to the California authorities for having intercourse with L.T.[3] In that action, L.T. originally testified that S.J. had molested her. Charges were subsequently dropped when she recanted that statement after talking to S.J.[4] At the custody proceeding L.T. testified she recanted her testimony regarding S.J.'s molestation because S.J. told her to and because she thought if she did not, her daughter, S.T., would be permanently removed from her custody  a fear engendered by S.J. She also testified that she trusted S.J.[5]
After his release from jail in California, S.J. and L.T. returned to Kentucky (L.T.'s mother had previously left S.J.). S.J. admits that it was on this trip that he first had intercourse with L.T.L.T. testified that after the return to Kentucky and the birth of S.J., Jr., when L.T. was fifteen, she attempted to leave S.J. She fled to her mother's home but her mother refused to let her keep her children there. She moved back with S.J. because she did not want to leave her children and feared they would be taken from her. Shortly thereafter S.J. moved L.T. and the two children to Alaska. They lived in Fairbanks for four months before S.J. left with S.J., Jr. at the request of L.T. She testified that she allowed S.J. to take S.J., Jr. because that was the only way in which he would leave. She subsequently filed the criminal action and custody proceeding.
The course of events described by L.T. falls squarely within the profile of what experts call "child sexual abuse syndrome." Typically, in an incestuous[6] abuse case, the abuser (generally the father, stepfather or another male authority figure in the household) engages in sexual conduct with the victim over a long period of time, generally "beginning when the child is pre-adolescent and continuing into the teenage years." D. Wells, Expert Testimony: To Admit or Not to Admit, Florida Bar J. 673, 674 (December, 1983).
*799 Some researchers have suggested that because there is generally a lack of overt physical force in incestuous relationships, the child victim must consent. Most commentators, however, recognize that such research incorrectly perceives the dynamics of an incestuous relationship. Rather than consenting to or initiating sexual encounters, most victims are coerced.
The coercion may be subtle and may be based on the nature of the parent-child relationship. The parent is in a position of authority and although a young child may feel uncomfortable about the relationship, she may consent because of a reluctance to disobey or a desire to please the parent.
... .
Fear provides another explanation for the child's acquiescence... . The child may ... fear that she will be blamed for the relationship and that she will be punished by the perpetrator and rejected by the passive parent.
Comment, Incest: The Need to Develop a Response to Intra Family Sexual Abuse, 22 Duq.L.Rev. 901, 905-06 (1983-84) (footnotes omitted).
Another commentator's remarks are equally revealing:
The real issue is whether a child can ever "consent" to incest. Incest is an abuse of a family power. The father takes unfair advantage of his position in the family by forcing his daughter to engage in sexual activity with him. It is irrelevant whether this "coercion" is actual "fear of being spanked or punished," or whether she engaged in intercourse to get new clothes. The issue is whether she could choose not to consent, because it is questionable whether any child has the real ability to ignore the power structure in the family. Children are taught to obey their parents. In most incestuous families the father is domineering, autocratic, and powerful in his relationship with his children. Thus, it is highly unlikely that the child can choose not to consent.
P. Coleman, Incest: A Proper Definition Reveals the Need for a Different Legal Response, 49 Mo.L.Rev. 251, 263 (1984) (footnotes omitted).
Other characteristics of the incestuous relationship have been described as follows:
The encounter begins with gentle touching and evolves over a period of time to include incestuous intercourse. Seldom is physical violence involved. If the daughter expresses a reluctance to continue the relationship, the father allays her fears and subverts her will through parental dominion and coercion.
... .
Usually the daughter is unaware of the moral, social, and legal restrictions placed upon such activity; however, this is not true for the father. To protect himself he creates a pact of secrecy with his daughter. Through overt threats and parental dominion, the father effectively prevents the daughter from confiding in anyone.
Comment, Characterization of the Daughter as an Accomplice in Incest Prosecutions: Does Texas Immunize the Father, 20 Hous.L.Rev. 1129, 1136 (1983) (footnotes omitted). Another commentator suggests that incestuous abuse is quite different from "stranger abuse:"
[I]ncestuous abuse is apt to be chronic, extending over a period of years, because the abuser has ready access to the child. The incestuous abuser holds his victim in a particularly helpless position because the child is ordinarily financially and psychologically dependent upon him and, in addition, the abuser is in a natural position of authority over the child.
Comment, The Crime of Incest Against the Minor Child and the States' Statutory Responses, 17 J.Fam.L. 93, 99-100 (1978-79) (footnotes omitted).
Courts recognize the difficulty in deciding incestuous abuse cases. Because of the nature of the relationship and its psychological impact on the child, evidence is often conflicting. Many courts now admit expert testimony on "child sexual abuse syndrome." Expert testimony on the child *800 sexual abuse syndrome indicates that abused children often recant their prior testimony or make inconsistent statements. In deciding to admit expert testimony one court indicated that it was doing so because:
The emotional trauma to which the child victim of sexual abuse has been subjected causes the victim to react and behave in a different manner from many other crime victims... . The child is likely to be reluctant to testify against the defendant who is a parent or other family member and indeed may be under the pressure from other members of the family to recant the allegations. The perpetrator of the abuse may also have used threats or other forms of coercion to enforce the secrecy of the relationship. Moreover, the abuse often begins at an early age and continues for a long period of time, so the child is likely to be relating events which occurred some time in the past and which the child may not have completely understood while they were happening.
Commonwealth v. Baldwin, 348 Pa.Super. 368, 502 A.2d 253, 258 (1985) (footnote omitted). See also People v. Payan, 173 Cal. App.3d 27, 220 Cal. Rptr. 126, 131-33 (1985) (quoting R. Summit, M.D., The Child Sexual Abuse Accommodation Syndrome, 7 Child Abuse & Neglect 177-93 (1983)); State v. Myers, 359 N.W.2d 604, 608-09 (Minn. 1984); State v. Middleton, 294 Or. 427, 657 P.2d 1215, 1220 (1983) (useful for jurors to hear expert testimony because it is not uncommon for victims to deny the act ever happened).
When L.T.'s conduct is viewed in this light it is clear that her sexual relationship with S.J. was never "consensual." This court, I assume, would not hesitate to deny the existence of parental rights to a man who raped a woman in a single sexual assault. It is my opinion that the court should also deny the existence of any parental rights where the offspring resulted from abuse by the stepfather of a child in his care for eight years.[7]
I would affirm the trial court's denial of parental rights to S.J. for the foregoing reasons.
RABINOWITZ, Chief Justice, concurring.
I concur in the court's holdings regarding jurisdiction as well as the majority's further conclusion that the superior court erred in terminating S.J.'s parental rights because the origins of the same arose out of a criminal relationship with the child's natural mother. On the other hand, I think it of critical importance to emphasize that on remand it remains open to L.T. and to S.J., Jr. through his guardian ad litem to demonstrate to the superior court that no parental rights ever attached in S.J. In this regard I am of the view that the theory advanced by Justice Burke in his dissent has considerable merit. I also think it important that the courts of Alaska neither recognize nor enforce parental rights in the circumstance where they have been obtained in an egregious manner.
NOTES
[1] S.J. claims that he was doing nothing wrong at that time because he thought L.T. was legally emancipated through marriage. L.T. had married a serviceman in Oklahoma earlier in the year, a marriage L.T. claims S.J. arranged to cover up his wrongdoing. A month after the wedding, L.T.'s first child, S.T., was born. This child is not involved in this appeal.
[2] AS 25.30.020 provides in pertinent part:

(a) The superior court has jurisdiction to make a child custody determination by initial or modification decree if the conditions set out in any of the following paragraphs are met:
(1) this state (A) is the home state of the child at the time of commencement of the proceeding, or (B) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of removal or retention by a person claiming custody or for other reasons, and a parent or person acting as parent continues to live in this state; or
(2) the child is physically present in this state and is a child in need of aid as defined in AS 47.10.290; or
(3) it (A) appears that no other state would have jurisdiction under prerequisites substantially in accordance with (1) or (2) of this subsection, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (B) it is in the best interests of the child that this court assume jurisdiction.
[3] AS 25.30.900(5) provides in full as follows:

(5) "home state" means the state in which the child, immediately preceding the time involved, lived with the child's parents, a parent, or a person acting as a parent, for at least six consecutive months, and in the case of a child less than six months old, the state in which the child lived from birth with any of the persons mentioned; periods of temporary absence of any of the named persons are counted as part of the six-month or other period; . .. .
[4] S.J. was in jail in Ohio on probation violations from December 1981 until late May 1982.
[5] AS 25.30.900(5), supra n. 3.
[6] Even if Kentucky was S.J., Jr.'s "home state," this court could assume jurisdiction based on meeting the alternative requirement that Kentucky declined jurisdiction in favor of Alaska. A Kentucky court examined the Alaska temporary custody order and gave it full faith and credit in that state, implying that Kentucky declined jurisdiction. Although it is not clear whether Kentucky addressed this issue specifically, S.J. asserts that it did. S.J. claims Kentucky erred in this respect. In either case the question comes down to whether it is in the best interests of the child that this state decide the custody case.
[7] The basis for the Rexford decision closely parallels subsection 3(a)(2) of the original UCCJA, which provides:

A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:
... .
(2) it is in the best interest of the child that a court of the state assumes jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships; ... .
California enacted this provision, but Alaska did not. We do not rely on this deleted provision to arrive at our deferral determination under AS 25.30.050.
[8] We take this opportunity to urge the legislature to consider issues such as those raised in this case in order to provide courts with necessary guidance in resolving sensitive questions.
[9] See AS 25.23.180 and AS 47.10.080(c)(3).
[10] AS 25.23.180(e) states:

A petition for termination of the relationship of parent and child made in connection with an adoption proceeding may be made by (1) either parent if termination of the relationship is sought with respect to the other parent, ... .
[11] AS 25.23.180(a) and (b) provide:

(a) The rights of a parent with reference to a child, including parental right to control the child or to withhold consent to an adoption, may be relinquished and the relationship of parent and child terminated in or before an adoption proceeding as provided in this section.
(b) All rights of a parent with reference to a child, including the right to receive notice of a hearing on a petition for adoption, may be relinquished and the relationship of parent and child terminated by a writing, signed by the parent, regardless of the age of the parent, a copy of which shall be given to the parent,
(1) in the presence of a representative of an agency taking custody of the child, whether the agency is within or outside of the state or in the presence and with the approval of a court within or outside of this state in which the minor was present or in which the parent resided at the time it was signed, which relinquishment may be withdrawn within 10 days after it is signed or the child is born, which ever is later; and the relinquishment is invalid unless it states that the parent has this right of withdrawal; or
(2) in any other situation if the petitioner has had custody of the minor for two years, but only if notice of the adoption proceeding has been given to the parent and the court finds, after considering the circumstances of the relinquishment and the long continued custody by the petitioner, that the best interest of the child requires the granting of adoption.
[12] AS 25.23.180(c) provides in part

The relationship of parent and child may be terminated by a court order issued in connection with an adoption proceeding under this chapter or a proceeding under AS 47.10: ... .
Although both parties cite this section, neither analyzes the interplay between it and AS 25.23.180(e), the section they primarily rely on to support their arguments. The use of "in connection with" in subsection (c) strengthens S.J.'s argument that termination must take place in an adoption proceeding if there has been no voluntary relinquishment under subsection (b) or a proceeding under AS 47.10.
Judge Hodges concluded that termination of parental rights absent an on-going adoption was justified because Alaska allows single parent adoptions. His reliance on the fact that this state allows single parent adoptions appears to be a non sequitur.
[13] We are not unsympathetic to the theory raised in Justice Burke's dissent, i.e., that because of the nature of the relationship no parental rights ever attached in S.J. However, given the procedural posture and record in this case, we cannot consider this theory. The parties neither raised nor briefed it. As it stands, the record contains no evidence regarding the child sexual abuse syndrome, either in general or as it might apply to L.T. The trial court made no findings of fact regarding whether L.T. actually consented to the sexual conduct which resulted in S.J., Jr.'s conception, nor whether she fits the profile of the syndrome. It would be improper for us to consider this theory based on the record before us. We agree, however, that under some circumstances mere biological parenthood is insufficient to carry with it parental rights; courts do not lack authority to make a declaration to that effect.
[1] S.J. did eventually "marry" L.T.'s mother. That marriage may have been bigamous and, therefore, void.
[2] That section provides:

(a) A person commits the crime of sexual assault in the first degree if,
(1) being any age, he engages in sexual penetration with another person without consent of that person.
"Without consent" means that a person "with or without resisting, is coerced by the use of force against a person or property, or by the express or implied threat of imminent death, imminent physical injury, or imminent kidnapping to be inflicted on anyone." AS 11.41.470(3)(A) (emphasis added).
[3] The "family" lived in California for a short while. It was there that L.T. met R.T. and the marriage plans were made.
[4] The California court, however, ordered S.J. to stay away from L.T., an order he immediately disregarded.
[5] A friend of L.T.'s in Alaska testified that L.T. treated S.J. as a "father-figure." She also testified that S.J. regularly forced L.T. to have sexual relations with him before L.T. could leave the house.
[6] "Incest," for purposes of this dissent, is used to describe sexual conduct between an adult authority figure and a child in his care. It does not describe the conduct prohibited by AS 11.41.450.
[7] My reading of the majority's opinion suggests that on remand the trial court could make further findings on the consensual nature of S.J. and L.T.'s relationship when S.J., Jr., was conceived. Such findings may be sufficient to support a holding that parental rights never attached.