79 P.3d 623 (2003)
In the Matter of the ADOPTION OF KEITH M.W.
Native Village of Napaimute Traditional Council, Appellant,
v.
Terence W. and Lucy W., Appellees.
No. S-10489.
Supreme Court of Alaska.
October 31, 2003.
*624 Scott Jay Sidell and Patty Nieves, Association of Village Council Presidents, Bethel, for Appellant.
Andrew C. Mitton and Robert B. Flint, Hartig, Rhodes, Hoge & Lekisch, PC, Anchorage, for Appellees.
Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Amicus Curiae State of Alaska.
Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

OPINION
FABE, Chief Justice.

I. INTRODUCTION
This appeal presents issues arising from an Indian mother's decision to give up her baby and place him with a non-Indian adoptive couple and her later change of heart before entry of the adoption decree. After the mother purportedly relinquished her parental rights, the trial court issued a parental termination order. Despite the decision of the mother's tribe to intervene in this matter, and the fact that the mother subsequently changed her mind about giving up her child for adoption, the trial court found good cause to deviate from the placement preferences detailed in the Indian Child Welfare Act (ICWA) and finalized the adoption by the non-Indian couple. We conclude that the court's termination of the mother's parental rights based on her conditional relinquishment of rights was invalid. And although the mother's relinquishment functioned as a consent to adoption, under ICWA a parent may withdraw consent to adoption for any reason prior to entry of the final decree. But because during the pendency of this appeal the Indian mother reaffirmed her consent to the adoption of her child by the same non-Indian couple, we affirm the superior court's finding of good cause to deviate from ICWA's placement preferences and its issuance of a final decree of adoption.

II. FACTS AND PROCEEDINGS
On May 19, 1999, eighteen-year-old Andrea, a member of the Native Village of Napaimute, gave birth to a son, Keith.[1] Because of financial concerns, post-partum depression, and a diagnosis of cervical cancer, Andrea considered putting Keith up for adoption. In early September 2000 Lucy and Terence Wilson, the non-Indian sister and brother-in-law of a friend of Andrea's mother, Jenna, met with Andrea and her extended family to discuss the possibility of adoption. The parties agreed to an "open" adoption, whereby the Wilsons would allow Andrea and Jenna visitation rights. On September 19, 2000, Andrea signed a document in which she claimed to "voluntarily and unconditionally" relinquish her parental rights. But Andrea's relinquishment of parental rights was not "unconditional," as it contained the following statement: "If the adoption is not completed, I understand that this relinquishment will be voided." Thus, Andrea's relinquishment was conditioned on the Wilsons successfully adopting Keith. On October 3, 2000, the superior court issued a "final decree of termination of parental rights."
The Wilsons filed a petition for adoption on October 11, 2000. In mid-December 2000 the Native Village of Napaimute Traditional Council ("the tribe") was permitted to intervene in the adoption proceedings. Prior to the tribe's intervention, Andrea changed her *625 mind and voiced her wish to have Keith returned to her.
After the tribe's intervention, Superior Court Judge John Reese, in an opinion issued in January 2002, found that good cause existed for deviating from the ICWA placement preferences and placing Keith with the Wilsons. The primary basis for the superior court's decision was Andrea's earlier-expressed desire to deviate from the ICWA preferences when she relinquished her parental rights and placed Keith with the Wilsons. The superior court did not account for Andrea's change of preference:
The most obvious [reasons to deviate from ICWA] are, of course, first of all, the mother's preference in the relinquishment and the termination. There's solid legal basis for this in the Indian Child Welfare Act, in the guidelines, as well as in the cases interpreting the act and the guidelines, so that probably is sufficient by itself, but there is more. . . . [Andrea] gave up [Keith]. That's it. That gets us past the preferences.
We asked for supplemental briefing on a number of issues, including the validity of the relinquishment and the termination order. After supplemental briefing was completed, the Wilsons supplemented the record with a notarized letter from Andrea stating her request that the Wilsons "be able to fully adopt [Keith] without any further interference from myself or any other outside party." We then remanded this matter to the superior court for an expedited hearing and determination of the mother's consent to the adoption of Keith by the Wilsons. At the supplemental hearing on September 9, 2003, Andrea again consented to the adoption. On September 24 the superior court forwarded its report on remand, finding that Andrea voluntarily signed the consent to adoption in open court, that the terms and consequences were fully explained to and understood by her, and that the time for withdrawal of the consent had elapsed.

III. STANDARD OF REVIEW
The legal validity of a parental relinquishment or termination order is a question of law. For questions of law, the standard of review is de novo, and this court applies the rule of law that is most persuasive in light of precedent, reason, and policy.[2]

IV. DISCUSSION

A. Relevant ICWA Provisions
Reacting to a disturbing history of states placing Indian children in non-Indian parental care, Congress passed ICWA with the intention of discouraging this practice.[3] The act is intended "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families."[4] It attempts to achieve this objective by establishing "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture."[5]
One way that ICWA promotes these goals is through § 1913's requirement that courts return Indian children to their biological parents if those parents withdraw consent to adopt before issuance of a final adoption decree. While § 1913(a) recognizes that a parent may voluntarily consent to termination of parental rights in favor of foster care placement or adoption,[6] § 1913(c) provides that "[i]n any voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason *626 at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent."[7]
ICWA further advances its goals by preferring Indian adoptive parents over non-Indian adoptive parents. In determining the appropriate adoptive placement of an Indian child, ICWA requires that, in the absence of good cause, preference be given to placement with "(1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families."[8] ICWA does not define good cause, however, leaving it to the states to determine when good cause exists to deviate from the ICWA preferences.[9] The Bureau of Indian Affairs publication "Guidelines for State Courts; Indian Child Custody Proceedings" lists factors that may convince state courts that good cause does exist to deviate from the ICWA preferences.[10] Although the guidelines are only persuasive and are neither exclusive nor binding, "this court has looked to them for guidance."[11] These factors include: (1) the extraordinary physical and emotional needs of the child as established by testimony of a qualified expert witness; (2) the unavailability of suitable families for placement after a diligent search has been completed for families meeting the preferences requirements; and (3) parental preferences in favor of deviation.[12] Accordingly, we have held that courts may consider parental preference when determining whether there is good cause to deviate from ICWA preferences.[13]
The superior court found that Andrea's initial desire to deviate from the ICWA placement preferences at the time she signed a document purporting to relinquish her parental rights was the primary factor establishing good cause to deviate from the ICWA preferences. The court did not consider the mother's subsequent changed wishes when ruling that good cause existed to deviate from the ICWA preferences. And once the mother's rights were terminated, it is questionable whether she would have standing to state a "parental preference."[14] But the question remains whether there was a valid final decree of parental termination in this case that would prevent Andrea from withdrawing her consent to adoption pursuant to § 1913(c) of ICWA. The answer to this question hinges on the validity of Andrea's relinquishment of parental rights.

B. Relinquishments Must Be Unconditional.
We have recognized that "[p]arental termination proceedings were unknown at common law. This means that in the absence of statutory authorization there can be no termination of parental rights and obligations."[15] One way that a parent's rights may be terminated is through a voluntary relinquishment. Relinquishments are regulated by AS 25.23.180(a) and (b) and may *627 occur "in or before an adoption proceeding."[16] It "obviously is permissible in some cases" for relinquishments to occur in the absence of pending adoption cases.[17] As we have explained, the relinquishment procedure established by AS 25.23.180(b) "does not contemplate involuntary termination actions, but rather refers to cases in which parents choose to give up their parental rights."[18] However, the statute makes no provision for relinquishment of less than all rights. Moreover, the time frames for a parental change of mind are expressly set out in the statute,[19] and there is no provision allowing a parent to withdraw the relinquishment after those deadlines if certain conditions have not been met.
Despite its caption as a "relinquishment," the document that Andrea signed in this case was not an unconditional relinquishment; instead, it functioned as a consent to adopt. Andrea did not unconditionally relinquish her parental rights in this case. Indeed, her relinquishment was expressly conditioned on the successful completion of adoption by specified adoptive parents, the Wilsons. Andrea's relinquishment contained the statement: "If the adoption [by the Wilsons] is not completed, I understand that this relinquishment will be voided." Yet Alaska's adoption statute does not recognize a relinquishment of parental rights that is less than an absolute and permanent surrender of rights. Alaska's adoption statute provides that "[a]ll rights of a parent with reference to a child ... may be relinquished and the relationship of parent and child terminated by a writing, signed by the parent."[20]
Courts in other jurisdictions have concluded that parents may not relinquish their parental rights on condition that specified adoptive parents be granted the child. The South Dakota Supreme Court held in In re Termination of Parental Rights Over J.M.J. that a mother, who relinquished her parental rights and requested that the child be placed with her sister and brother-in-law in Arizona, could not withdraw her relinquishment even though her sister and brother-in-law subsequently requested that J.M.J be removed from their home because of the couple's marital problems.[21] The court concluded that the mother understood the termination to be irrevocable and noted that "there can be no conditional relinquishment of parental rights under [South Dakota] statutes."[22] As a result, "[i]t follows ... that D.J.'s request to have J.M.J. placed for adoption with the Filipeks cannot in any way be characterized as a condition, the nonfulfillment of which[ ] is fatal to D.J.'s consent to termination of her parental rights."[23]
A Colorado Court of Appeals decision similarly concluded that a nineteen-year-old father and seventeen-year-old mother attempted an impermissible "partial" or "conditional" relinquishment.[24] In the relinquishment petition, the parents changed the official, generic Colorado relinquishment form and added that possession of the child would be with the child's grandparents.[25] Furthermore, testimony made it clear that "the child had been in the care of the grandparents for approximately one year" and "that the relinquishment proceedings were instituted as part of a family plan that the child would be adopted by the grandparents."[26] The court held that it was apparent from the petition and the testimony "that the parents were attempting a `partial' or `conditional relinquishment.'"[27] The court found that such a conditional relinquishment was not authorized by the Colorado relinquishment statute which, like the Alaska Statute, mandated that *628 "relinquishment shall divest the relinquishing parent or parents of all legal rights and obligations."[28]
The concurrence argues that Alaska case law "reflects the use of conditional relinquishments."[29] Specifically the concurrence refers to two cases, In re Adoption of F.H.[30] and In re J.L.F.[31] In F.H., the mother of an Indian child consistently expressed a parental preference for the superior court to deviate from the ICWA parental preferences.[32] F.H.'s tribe requested that the court not deviate from the ICWA placement preferences.[33] In ruling that the superior court did not err in finding good cause to deviate from the preferences, we noted that the mother exhibited a consistent preference for deviation.[34] While the mother did sign a purported relinquishment conditioned on a specified couple adopting F.H., the mother never changed her mind about the adoption.[35] Consequently, whether the purported relinquishment was a relinquishment or a consent was immaterial, as either way the adoption would have gone forward. Therefore, our ruling in F.H. did not sanction the use of conditional relinquishments. And J.L.F. does not deal with relinquishments; rather, it is a termination case.[36] There, we held that "the trial court erred in concluding that unreasonable withholding of consent to adoption as provided in AS 25.23.180(c)(2) was a ground for termination of parental rights applicable in this case."[37]J.L.F., then, does not directly support the proposition that conditional relinquishments are permissible in Alaska.[38]
The Uniform Adoption Act's commentary supports our conclusion: "A parent or guardian who makes a direct placement of a minor for adoption must execute a consent for the adoption to go forward."[39] Whereas, "[i]f the parent or guardian prefers, instead, to have an agency place the minor and consent to the minor's adoption, the parent or guardian has to relinquish all rights with respect to the minor to the agency."[40] After a parent relinquishes her rights and places a child with an agency, then "the agency acts in lieu of the parent or guardian: it acquires custody of the minor and the authority to place the child for adoption."[41] Because Andrea placed Keith directly with the Wilsons, her parental consent was needed and her relinquishment was improper.[42]
*629 In summary, a biological parent may not relinquish parental rights conditioned upon successful completion of adoption by specified adoptive parents. Relinquishment requires a permanent and unconditional surrender of parental rights. Consequently, Andrea's initial conditional relinquishment of parental rights was not permitted by statute and was invalid.
C. Andrea's Invalid Relinquishment Functioned as a Consent To Adopt.
Although Andrea's conditional relinquishment of parental rights was invalid in that it was contingent on the successful adoption of Keith by the Wilsons, the document that she filed did function as a consent to adoption. Parental consent "lies at the foundation of the adoption process."[43] A parent may consent to adoption by specific adoptive parents, whose identities may or may not be known to the biological parents.[44] Under AS 25.23.060, a parent's consent ordinarily delegates to the adoptive parents all powers permitted under AS 13.26.020, including the "powers regarding care, custody, or property of the minor child or ward."[45]
While Andrea signed a document purporting to relinquish her parental rights on condition that the Wilsons successfully adopt Keith,[46] and while a proper relinquishment eliminates the need for parental consent in an adoption proceeding, we look at the function and not the title of documents to determine their purpose. In S.O. v. W.S., we examined a similar document purporting to relinquish parental rights and held that regardless of its caption, the "relinquishment" in question was actually an attempt to consent to adoption.[47] S.O. was a pregnant woman expecting to take a job on the North Slope and desiring to locate adoptive parents for her unborn child.[48] With the help of the paternal grandmother and the grandmother's spouse, S.O. located a prospective couple but requested that the couple's identity not be disclosed to her.[49] The day after the child's birth, S.O. signed a document entitled "Relinquishment of Parental Rights," which purported to relinquish her rights and granted custody to her attorney, who was to take all steps necessary for the child's adoption by the prospective adoptive couple.[50] About a week after giving birth, S.O. changed her mind about going to the North Slope and giving up her child for adoption. She argued that any adoption proceeding would be invalid because she never consented to an adoption.[51] Unpersuaded by this argument, we stated that "we think it abundantly clear that S.O. did in fact intend to consent to her son's *630 adoption. That the document purports to be a relinquishment is not controlling."[52] The document signed in this case, like that in S.O., was an attempt to consent to a particular adoption. Thus, the superior court's reliance upon it in terminating the mother's parental rights was erroneous.
D. Under ICWA, Andrea Should Have Been Permitted To Withdraw Her Initial Consent to Adoption Prior to Entry of the Final Adoption Decree.
Under ICWA, a biological parent may withdraw consent to adoption "for any reason at any time prior to the entry of final decree of ... adoption ... and the child shall be returned to the parent."[53] Because Andrea changed her mind prior to the final decree of adoption and wanted Keith back despite her earlier consent to adoption by the Wilsons, Keith should have been returned to Andrea at the time she withdrew her consent. However, this point is now moot, given that Andrea has reaffirmed her consent to the adoption during the pendency of this appeal.
If we did not treat Andrea's initial conditional relinquishment of parental rights in favor of adoption by a specific couple as a consent to adoption, we would eviscerate a key ICWA provision. The statutory consent provisions provide for a relatively lengthy parental withdrawal period and "are designed to protect the natural rights of a parent to the custody, society, comfort, and services of the child."[54] Permitting circumvention of these protections by pre-adoption relinquishment in private party adoption cases would eliminate these protections of parental rights.[55] And if allowing such an end run would impair the rights of parents in non-ICWA cases, it would do even greater injury to the rights granted by ICWA to Indian families and the parents of Indian children. Because Andrea has ratified the adoption by reaffirming her consent to have Keith adopted by the Wilsons, we must now turn to the question whether the superior court properly deviated from ICWA's placement preferences.
E. Because Andrea Renewed Her Consent to Adoption by the Wilsons, the Superior Court's Deviation from the ICWA Placement Preferences Was Not Error.
In its initial January 2002 decision approving Keith's adoption by the Wilsons, the superior court found that good cause existed for deviating from ICWA placement preferences and that the adoption was in the best interests of the child. Judge Reese relied on several factors for deviating from the ICWA placement preferences, including Andrea's preference expressed when she purportedly relinquished her parental rights; the open nature of the adoption, which would allow Andrea to visit with Keith and assist the Wilsons in attending to Keith's cultural identity; and the emotional bonding of Keith to the Wilsons. Thus, the findings of the trial court in this case mirror those in F.H.,[56] where we affirmed the superior court's finding of good cause to deviate from the ICWA placement preferences based on, among other factors, the biological mother's preference for the placement, the bond between the adoptive parent and the child, and the "openness" of the proposed adoption. All of these factors are present in the case now before us.
Andrea's preference to have her son adopted by the Wilsons was reaffirmed during the pendency of this appeal. Upon receiving from the Wilsons a request to supplement the record with a notarized letter from Andrea in which she withdrew her demand for custody of Keith and requested that the Wilsons be able to adopt Keith "without any *631 further interference," we remanded this case to the superior court for a hearing and determination of whether Andrea wished to consent to the adoption of Keith by the Wilsons. On September 9, 2003, Andrea executed a consent to adoption in open court before a superior court master. The superior court waited ten days, the time limit for withdrawal of consent in a non-ICWA case, before reporting to us that Andrea's consent was voluntary, that the terms and conditions of the consent had been explained to Andrea in detail, and that Andrea fully understood this explanation. Thus, Andrea has reaffirmed her initial position in this case, expressed during her purported relinquishment of parental rights: She consents to Keith's adoption by the Wilsons and it is her preference to deviate from ICWA by placing Keith with the Wilsons, a non-Indian family.
The superior court's reliance on Andrea's preference to have Keith adopted by the Wilsons was central to its decision and "was an appropriate factor for the superior court to consider in its finding of good cause."[57] As we noted in F.H., "ICWA and the Guidelines indicate that courts may consider parental preference when determining whether there is good cause to deviate from ICWA preferences."[58] And although a pivotal factor in this case, it was not the only factor that the superior court took into account in its finding of good cause to deviate from the ICWA preferences.
After the tribe's intervention into the case, the superior court supplemented its findings of good cause by relying on factors other than the mother's preference. These included the open nature of the adoption. As we recognized in F.H., reliance on an adoption structure that will "ensure access" by the biological parent to the child is "a proper factor for the superior court to consider."[59] In its consideration of the importance of sensitivity by the adoptive parents in this case to cultural issues, the superior court characterized the open adoption as "a life raft." Although recognizing that the Wilsons "do not understand much about native culture," the court found that "[t]he open adoption offers relief," and that "[r]easonable contact with the birth family can take care of that." The court left open until a future hearing the specifics of the contact schedule, acknowledging that while weekly or even monthly contact was not contemplated, there was a need for "contact that's sufficient and appropriate for [Keith] to know the people who are his birth family as well as ... [have] enough of an exposure to them and enough time with them so that he can come to learn and experience those parts of his culture as well as the parts that the [Wilsons] can provide to him."[60]
Finally, the superior court relied on the bonding between Keith and the Wilsons to find good cause to deviate from ICWA's placement preferences. The trial court found that it was "clear" and "not contested" that "[Keith] ha[d] closely bonded to the [Wilsons]" at the time of the October 10, 2001 hearing on the adoption. Two years have elapsed, and that bond has undoubtedly strengthened with time. As we noted in F.H., bonding between the adoptive mother and the child was "a proper factor for the superior court to consider."[61]
*632 In sum, the superior court based its determination of good cause to deviate from ICWA's placement preferences on appropriate factors, and we affirm its decision on this issue.

V. CONCLUSION
Andrea's conditional relinquishment of parental rights was invalid. Instead, it functioned as a consent to the Wilsons' adoption of Keith. Although ICWA enables a biological parent to withdraw consent at any time before the finalization of an adoption, in this case, Andrea has reaffirmed on the record her consent to the adoption of Keith by the Wilsons previously ordered by the trial court. Because the trial court did not err in determining that good cause exists to deviate from ICWA's placement preferences, we AFFIRM the court's entry of the decree of adoption and REMAND for a determination of the nature and schedule of contact and visitation as provided in the adoption decree.
MATTHEWS, Justice, concurring.
MATTHEWS, Justice, concurring.
I agree that the decree of adoption should be affirmed and that it is appropriate for the superior court on remand to address the subject of visitation. I therefore concur in the result of today's opinion. But I disagree with the opinion's conclusion that the final decree of termination is invalid. The natural mother's recent reaffirmation of her desire to have the Wilsons adopt the child has mooted this point in this case. But in future cases the dicta in today's opinion may have the effect of disturbing existing adoptions and adoptive placements and will change Alaska adoption practice. I therefore write separately to express my disagreement. In my view, the adoption decree should have been affirmed even if the natural mother had not, in the eleventh hour of the appeal, ratified the adoption. The discussion that follows is written without taking her ratification into account.
Today's opinion states that the final order of termination is invalid because the relinquishment on which it is based is invalid. The opinion argues that the relinquishment is invalid for two reasons. First, because it expresses an understanding (the "condition") that if the child is not adopted by the Wilsons the relinquishment will be voided. This provision is invalid, according to the opinion, because it is a condition, and our statutes do not permit conditional relinquishments. It follows, the opinion concludes, that the relinquishment as a whole is invalid. Second, the opinion argues that the relinquishment is invalid because use of relinquishments, rather than consents to adoption, is impermissible in private party adoption cases.
I disagree. For two independent reasons I do not believe that the expressed understanding that the relinquishment can be withdrawn if the Wilsons do not adopt the child makes the relinquishment invalid. First, regardless of its validity, the condition is irrelevant because we know that it will not occur. The Wilsons have adopted the child. Second, properly construed the condition is not prohibited by the Alaska Statutes, mainly because it is consistent with remedies that are available under current law to a relinquishing parent upon the failure of a contemplated adoption. As to the issue of whether relinquishments rather than consents may be used in private party adoptions, the Alaska Statutes suggest that relinquishments may be used in such cases.
The paragraphs that follow explain my position in more detail. Before discussing each issue separately, I make a number of points that are common to each.
The statutory section concerning relinquishments is AS 25.23.180. I set out its relevant subsections in the margin.[1] This *633 section and most of the rest of Alaska's adoption act were enacted in 1974 based on the 1969 Uniform Adoption Act as revised in 1971.[2] Section .180's counterpart in the 1969 Uniform Adoption Act is section 19.[3] The 1969 Uniform Act should not be confused with the very different 1994 Uniform Adoption Act which Alaska has not adopted.[4]
Alaska's adoption act contains its own rule of construction. Alaska Statute 25.23.005 provides: "This chapter shall be liberally construed to the end that the best interests of adopted children are promoted. Due regard shall be given to the rights of all persons affected by a child's adoption." Although section .005 was enacted in 1990, it is consistent with the rule of construction that we had previously adopted. In S.O. v. W.S. we rejected a rule of strict construction for our adoption act.[5] Instead we stated that the act should be construed in a manner that best accomplishes the overriding purpose of the act, promoting the welfare of children. We warned against "permitting mere technical defects in consents to adoption to serve as a basis for disrupting familial ties and relationships that have developed in reliance on the validity of such consents."[6] The same admonition must also apply to relinquishments.
The damage that can be done to children by disrupting psychological ties between adoptive parents and children is well recognized. *634 As we stated in Hernandez v. Lambert, "[a]doptive custody results in the rapid development of lasting and powerful psychological ties between adoptive parents and children, especially young children. Once formed, these bonds can seldom be severed without irreparable damage to the child's well being."[7]

I. The Condition Is Irrelevant Because it Will Not Occur.
We know that the condition that the relinquishment may be voided if the Wilsons do not adopt Keith will not occur because the superior court has entered a decree of adoption in favor of the Wilsons. Under this circumstance the condition is moot and can properly be ignored. The natural mother's expectations have been satisfied. There is no need to speculate as to what a proper judicial response would be if the condition had occurred, because we know that it will not occur.
I know of no case that suggests that an adoption should be invalidated because it is based on a relinquishment that is subject to an impermissible condition where it is known that the condition will not be realized. To the contrary, in In re J.R.S. we held that the defeasing condition expressed in AS 25.23.180(g) (authorizing the withdrawal of a relinquishment with the consent of the person having custody of the child where the child is not placed for adoption) did not destroy the finality of a termination decree for ICWA purposes because the condition had not occurred and the condition was thus "not relevant."[8]
This is not a case in which a parent attempts to revoke a relinquishment before her child has been placed for adoption. AS 25.23.180(g), which provides that a decree terminating parental rights may be vacated if the child has not been placed for adoption and the person having custody agrees to the decree's vacation, is not relevant here. Nothing in the statute governing relinquishments suggests that the decree the superior court entered was anything less than final.[[9]]
The teaching of J.R.S. is that where a condition that could cause the avoidance of a relinquishment will not occur, the fact that at the time of the termination decree the possibility that the condition might occur was still open is not relevant. Once we know that the condition will not occur it may be ignored.
Such a rule makes eminent good sense. No conceivable purpose is served by vacating an adoption based on a hypothetical possibility that we know will not occur. In such circumstances, the best response is simply to treat the condition as irrelevant. Consistent with the statutory and case law rule of construction noted earlier, this is the response that promotes the best interests of adopted children and avoids the disruption of familial ties and relationships that have developed as a result of an adoptive placement.
II. Relinquishments May be Terminable upon the Failure of a Contemplated Adoption.
The point that the condition is irrelevant because it will not occur is, in my opinion, a sufficient response to the majority's position that the conditional nature of the relinquishment would require the present adoption to be set aside. But I also believe that properly understood the condition is permissible for the reasons that follow.
An opinion of the Massachusetts Supreme Court, In re Adoption of a Minor,[10] contains a useful analysis of a questioned condition in an adoption context. In that case the natural mother consented to the adoption of her child by the adoptive parents "on condition that they will give me visitation rights...."[11] Although the adoptive parents allowed visitation, the natural mother attempted to withdraw her consent to adoption and petitioned for return of the child. She contended that her consent was unenforceable because it was conditional and therefore did not satisfy *635 the requirements of Massachusetts law and was against public policy.[12] The Massachusetts court, in an opinion authored by the distinguished jurist and law professor, Robert Braucher, held that the questioned condition did not invalidate the consent. The court first observed that the condition must be given a practical construction making it subject to the overriding interest in the welfare of the child. Justice Braucher wrote:
We think that the mother in this case sought, not a legal assurance of visitation rights overriding all requirements of the welfare of the child, but a practical assurance of the cooperation of the petitioners so long as visitation rights were not contrary to the interests of the child. She got what she sought. If she had not tried to withdraw her consent, a decree of adoption might have been entered incorporating the agreement. Such a decree would not be void. But it would not prevent "the supreme inquiry as to the requirements of the welfare of the child."[[13]]
As so construed, the court found the condition not to be against public policy. But the court went on to observe that if the condition were found to be against public policy, the condition would be unenforceable, but the consent to adoption would still be valid:
If the agreement had provided for a legal right overriding the welfare of the child, it would at least to that extent be against public policy, but the result would be that the offending provision would be unenforceable, not the consent to adoption. Otherwise, the overriding policy serving the welfare of the child would be frustrated.[[14]]
I believe that the condition in this case must be construed at all times to be subject to the overriding interest in the welfare of the child. It should also, in my judgment, be given a practical construction similar to that employed by the Massachusetts court in In re Adoption of a Minor. What it contemplated was that the Wilsons would go forward with the adoption, but if the adoption failed it was understood that they would not stand in the way of the resumption of custody by the natural mother. As so construed, the condition is fully consistent with existing remedies that are available following the failure of a contemplated adoption.
There are three principal remedies for failed adoptions. The first is contained in AS 25.23.180(g).[15] This subsection contains a provision that permits a parent to withdraw her relinquishment if the child "is not on placement for adoption" with the consent of the party having custody of the child. The second remedy is contained in AS 25.23.120(d). This subsection requires the court, upon determining that an adoption petition must be denied, to decide who should have custody of the child, considering the child's best interests.[16] A voluntarily terminated parent is not excluded from the group of potential custodians under this section.[17] The third remedy is found in Civil Rule 60(b) (permitting relief from judgments in defined circumstances). A relinquishing parent, like any other litigant, may avail herself of the remedies provided by Civil Rule 60(b).[18] Relief is sometimes afforded under this rule's catch-all clause, 60(b)(6) ("any other reason justifying relief from the operation of the judgment"), when in important ways a fundamental assumption underlying the basis for consenting to a judgment has been destroyed.[19] *636 Construed reasonably and practically, the condition in question fits readily within these remedies. If the Wilsons were to have a change of heart after accepting custody of the child or if their adoption efforts failed and the child was therefore no longer on placement for adoption, subsection .180(g) would be applicable. Subject to considerations of the best interests of the child, the understanding reflected in the relinquishment that the natural mother would resume custody could be realized. If the adoption was actually denied, AS 25.23.120(d) would also apply and the court would have to determine, considering the best interests of the minor, who would have custody of the minor. In such a proceeding the Wilsons' cooperation with the efforts of the natural mother would be expected, though it might be of little importance given that their adoptive efforts would already have been refused. As to the potential 60(b) remedy, the condition reflects a fundamental assumption that exists in most private party adoption cases, namely that the parties to whom the child is relinquished for adoption would adopt the child. Even when not made a condition, one would expect that this would be the assumption of the relinquishing parent. Upon the failure of such an assumption, Rule 60(b)(6) relief should be available. Since this could be the case even if the assumption were not expressed as a condition, the fact that the condition is expressed should not make a difference. The same relief should be available either way.
In short, I believe that the expression of the understanding that if the Wilsons did not adopt the child the relinquishment would be voided, when given a reasonable and practical construction, is consistent with and, at most, facilitates the remedies that would be available in any event to the natural mother. It is therefore unobjectionable.
It is undisputed that relinquishments that are subject to withdrawal upon the failure of specified parties to adopt a particular child have long been used in Alaska adoption practice. The State of Alaska acknowledges that the Division of Family and Youth Services "has allowed conditional relinquishments in the past." Currently the policy and procedure manual of the division still contemplates that parents may relinquish their parental rights "with the understanding that their child will be adopted by a specific person." The division treats this understanding as subject to the welfare of the child.[20]
Our case law reflects the use of conditional relinquishments. In In re J.L.F. the state negotiated a conditional relinquishment with the biological mother which, eventually, the biological mother refused to sign.[21] This refusal was found by the superior court to be a reason in support of the superior court's finding under AS 25.23.180(c)(2) that the biological mother had unreasonably withheld her consent to adoption.[22] In In re Adoption of F.H. a relinquishment conditioned on adoption by particular prospective adoptive parents was employed.[23] An adoption in favor of these prospective parents would have *637 amounted to a deviation from the ICWA preferences.[24] The superior court held that the conditional nature of the relinquishment was one reason why good cause existed for deviation from the ICWA preferences, because otherwise there would be much uncertainty concerning the child's future.[25] We upheld the court's reliance on the conditional nature of the relinquishment.[26]
The historic use of conditioned relinquishments in Alaska is relevant in considering whether the Alaska Statutes should be construed as prohibiting the practice. "The meaning attached by people affected by an act may have an important bearing on how it is construed."[27] In addition, adopting parties and their counsel have relied on this practice, its recognition by the courts, and the fact that it has never been questioned, in structuring adoptions. This reliance is also a reason favoring a permissive construction: "One of the soundest reasons sustaining contemporaneous interpretations of long standing is the fact that the public has relied on the interpretation."[28] Such an interpretation is also called for by the applicable rule of construction that Alaska's adoption statutes should be construed to promote the best interests of adopted children and avoid disrupting adoptive placements.[29]
I also believe that the law of contracts provides an applicable analogy that should guide our decision as to whether the current relinquishment is unenforceable. Under contract law, whether a contract or a part of a contract is unenforceable entails a balancing of the interests for and against enforcement.[30] In weighing the interest in enforcement, account must be taken of the justified expectations of the parties, any forfeiture that would result if enforcement were denied, and any special public interest in enforcement. In weighing the public policy against enforcement, account must be taken of the strength of the policy against enforcement, the likelihood that a refusal to enforce will further that policy, the seriousness of any misconduct, and the directness of the connection between any misconduct and the questioned provision.
Viewing the relinquishment as a whole, the interest in its enforcement readily outweighs any public policy against its enforcement. First, all parties justifiably expected that the relinquishment would be enforceable. Second, the forfeiture involved is the severance of the bonded parent/child ties that have *638 developed between the child and the Wilsons. This is an extraordinarily strong interest. Relatedly, the special public interest involved is the public interest in the stability of adoptive placements. This too is an extraordinarily strong interest.
I am at a loss to express what the public policy might be against enforcement of the relinquishment. No judicial decision of this court has ever expressed a policy against conditional relinquishments. The two cases on which the majority opinion relies from other jurisdictions[31] express the view that there can be no conditional relinquishment under the statutes in their respective states, but they express that conclusion without giving reasons. The only public policy reason offered by the majority is that relinquishments have shorter periods for their withdrawal than do consents,[32] but this reason challenges the use of relinquishments in all adoptions, and has nothing to do with the conditionality of relinquishments.[33] I had assumed, at least provisionally, that a defeasing condition such as we have here might be felt to be undesirable because it potentially interferes with the stability of an adoptive placement. But this is not likely to be the case because the relinquishment would not be revoked until and unless the placement failed to lead to adoption. It is the failure, not the condition, that would cause the instability.
Turning to the second relevant factor of section 178(3) of the Restatement, we can ask whether refusal to enforce the relinquishment will further the policy of stability of adoptive placements. The answer to that question is that just the opposite will occur where, as here (and as will commonly be the case), the contemplated adoption actually occurs. The policy of stability in adoptive placements is furthered by enforcing the relinquishment. Ironically, refusing to enforce the relinquishment causes instability. As to the third factor, there is no misconduct in this case. It is therefore apparent that the balance of relevant factors clearly favors the conclusion that the relinquishment is not unenforceable on grounds of public policy.
Another point should also be made. In light of the clear preponderance of interests favoring upholding adoptive placements, if the condition in this case were found to be against public policy, the condition should not be enforced, but this should not affect the validity of the relinquishment. As the Massachusetts court stated, if the agreement were "against public policy, ... the result would be that the offending provision would be unenforceable, not the consent to adoption. Otherwise the overriding policy serving the welfare of the child would be frustrated."[34]
In summary, the understanding expressed in the relinquishment in this case did not render the relinquishment invalid. Properly construed, it is consistent with remedies that the law provides to a relinquishing parent upon the failure of a contemplated adoption and is therefore unobjectionable. Further, similar provisions have long been used and recognized in Alaska without critical comment, and parties have relied on this practice. The practice does not violate public policy when one considers the relevant factors that should be considered in determining whether a provision is unenforceable on grounds of public policy. This interpretation satisfies the applicable rule of construction that Alaska's adoption statutes should be construed to promote the best interests of adopted children and to avoid disrupting adoptive placements. Finally, even if the questioned condition were against public policy, the appropriate remedy would be to declare the condition to be unenforceable but not the relinquishment.
III. Alaska Law Provides Two Methods for the Voluntary Termination of Parental Rights and the Adoption of ChildrenEither Method May Be Used in Private Party Adoptions.
Today's opinion holds that the final order of termination is invalid because it is based *639 on a relinquishment which might be voided if the Wilsons did not adopt the child. But the opinion also makes a second point, namely that relinquishments in private party adoption cases are simply impermissible.[35] As this point has nothing to do with the conditionality of any particular relinquishment, it would serve as a basis for invalidating the decree of termination in this case even if the relinquishment were not found to be invalid because of its conditional nature.
The majority makes the point that private placement adoptions cannot be accomplished by a method involving relinquishments without any analysis or discussion of the terms of the Alaska Statutes. Instead, the majority relies on the commentary to the Uniform Adoption Act of 1994.[36] While the Uniform Adoption Act of 1994 does contain a number of provisions making it clear that relinquishments can only be made to agencies,[37] the 1994 act has not been adopted in Alaska. As already stated, Alaska's laws pertaining to adoption were mostly passed in 1974 and were patterned on the 1969 Revised Uniform Adoption Act. Neither Alaska's statutes nor the 1969 Uniform Adoption Act contain provisions similar to the 1994 Uniform Adoption Act specifying that a relinquishment of parental rights may only be made to an agency.[38] To the contrary, Alaska law contains provisions that suggest that a relinquishment may be made in the context of a private party adoption.
One very strong suggestion is found in AS 25.23.180(e)(2). This subsection permits a petitioner for adoption, necessarily a private individual, to file "a petition for termination" of parental rights "in connection with an adoption proceeding." Adoption Rule 6(b) makes it clear that such a petition for termination may be based on a voluntary relinquishment of parental rights pursuant to AS 25.23.180(b). Thus a private individual may petition for termination based on a voluntary relinquishment given under subsection.180(b) in combination with the private individual's petition for adoption. This strongly implies that the relinquishment on which the private individual bases the combined petition for termination and adoption may permissibly have been given in favor of the private individual.
Further support is found in subsection.180(a) which provides that parental rights "may be relinquished and the relationship of parent and child terminated in or before an adoption proceeding as provided in this section."[39] Again, since adoption proceedings are only brought by private individuals this suggests that relinquishments may be used by private individuals in connection with adoption proceedings. Added support is *640 found in subsection .180(b)(1) which provides that a relinquishment must either be signed in the presence of the representative of an agency or "in the presence and with the approval of a court...." This suggests that relinquishments may be given in favor of private individuals, because signing before a court would not be necessary in the case of an agency taking a relinquishment.
Finally, AS 25.23.180(b)(2) applies to signed relinquishments that do not meet the formal requirements of (b)(1) where "the petitioner has had custody of the minor for two years ... and the court finds, after considering the circumstances of the relinquishment and the long continued custody by the petitioner, that the best interest of the child requires the granting of adoption." One would expect that relinquishments granted in favor of professional agencies would meet the formal requirements of (b)(1), whereas relinquishments in favor of private individuals are far more likely to be defective.[40] This savings clause thus seems squarely aimed at private party relinquishments.
Alaska law clearly provides for two parallel methods that lead to the same end result of termination of parental rights and adoption. That these dual methods exist is uncontested. What is at issue is whether the relinquishment method may be used in private party adoptions. I will here briefly describe each method.
The first method, the consent track, entails execution of a consent to adoption by the natural parent, filing a petition for adoption, and entry of an adoption decree.[41] The second method, the relinquishment track, does not require a consent to adoption, but entails execution by the natural parent of a relinquishment of parental rights, entry of a decree terminating parental rights, filing a petition for adoption, and entry of a decree of adoption.[42]
There are different safeguards that apply depending upon which track is used. The "change-of-mind" period for the consent track is, as a matter of right, ten days after the consent is given and, by leave of court upon a showing that withdrawal of consent is in the best interest of the child, any time before entry of a decree of adoption.[43] By contrast, the withdrawal period as a matter of right under the relinquishment track is ten days after execution of the relinquishment without a provision for subsequent withdrawal by leave of court.[44] But consents to adoption need only be signed before a notary,[45] whereas a relinquishment must be signed in the presence of an agency or the court, and if the latter, must also be approved by the court after an inquiry as to the parent's understanding of the consequences of the relinquishment and the voluntariness of her assent.[46] Alternatively, written relinquishments that do not meet the formal requirements of AS 25.23.180(b)(1) may still be valid but only if the private party petitioning for adoption has had custody of the child for two years and the court, after considering the circumstances of the relinquishment and the period of custody by the petitioner finds that the best interests of the child requires granting the adoption.[47]
That the relinquishment track may be used in private adoptions is supported by evidence of actual practice in Alaska over several decades. The record before us contains the *641 unrefuted affidavits of two experienced adoption attorneys who state that the use of the relinquishment track has long been a normal and accepted practice in private adoptions in Alaska.[48]
And two of our published cases confirm the use of the relinquishment track in private adoptions. In In re Adoption of F.H. the mother appeared before the probate master and executed documents "relinquishing her parental rights to the Hartleys."[49] Over the opposition of both the state and the child's tribe, an adoption decree in accordance with the private relinquishment was entered and affirmed by this court.[50]S.O. v. W.S. is another case in which the relinquishment method was employed in a private adoption context.[51]
As this case illustrates, parties have relied on the established and recognized practice described above. Further, as also noted, this practice finds much support in the Alaska adoption act. Because of these factors, the applicable rule of construction promoting the interest of children and disfavoring the disruption of bonded relationships based on adoptive placements also counsels in favor of an interpretation validating the existing practice.
Today's majority opinion views the use of the relinquishment track in private party adoption cases as an "end run" around the "relatively lengthy parental withdrawal period" built into the consent track.[52] But one could say by the same logic that use of the consent track circumvents the greater protection inherent in the more demanding execution requirements pertaining to relinquishments.[53] In truth, it is not appropriate to regard the use of one track rather than the other as a circumvention of protections built into the other because both tracks are legislatively permitted methods of achieving the same end.
The only public policy reason offered by today's opinion for setting aside the relinquishment is in order to "disallow the circumvention of procedures" inherent in the "relatively lengthy parental withdrawal period" allowed for adoptions under the consent *642 track.[54] Since the time for withdrawal as a matter of right is exactly the same under state law for relinquishments and consents, what the majority appears to be saying is that the longer periods for withdrawing relinquishments as a matter of right provided by ICWA are desirable as a matter of public policy.
My response to this is that the primary source of public policy employed by this court should be the Alaska Statutes. ICWA must be followed where it applies. But I do not think that ICWA should be regarded as a source for public policy based rulings where the periods it mandates do not apply and differ from the express provisions of Alaska law.
Alternatively, or in addition, the majority may be saying that a period for withdrawing relinquishments not as a matter of right but by leave of court is desirable as a matter of public policy. Such a period is provided by state law in consent track cases but not in relinquishment track cases. My response to this is that the majority's policy judgment is at bottom a quarrel with the dual track system provided under Alaska law. The legislature has chosen to provide no period for withdrawal by leave of court after the ten day withdrawal as a matter of right period in relinquishment track cases, while providing a period for withdrawal by leave of court in consent cases. It is not for this court to say which choice is better. I note, for example, that the 1994 Uniform Adoption Act does not contain any period during which an effort can be mounted to withdraw either a consent or a relinquishment on general best interests grounds.[55] Thus although the majority seems to endorse the view that a long period for withdrawal by leave of court is best, the current thinking of the commissioners on uniform state laws is consistent with the procedures in Alaska's relinquishment track, namely that there should be no such period.
Natural parents must be treated fairly. But their interests are subordinate to the goal of promoting the best interests of adopted children.[56] There is no question but that the procedures under either the consent track or the relinquishment track are fair to natural parents. The procedures under both tracks are designed to ensure that parents fully understand the consequences of their assent and that they have given it freely and voluntarily. Further, they are afforded a ten-day period during which, as matter of right, they may withdraw their consents or relinquishments.[57]
In summary, the majority reaches its conclusion that the relinquishment method for termination and adoption may not be used in private party adoption cases without any analysis of the text of our adoption act. A textual analysis strongly suggests that the relinquishment track is intended for private as well as agency use. Alaska adoption practice over the years lends support to this view as does the applicable rule of construction favoring the interests of children and the maintenance of adoptive relationships. The policy reasons offered by the majority for its conclusionbasically that longer withdrawal periods are better than shorter onesconflict with the choices made by the Alaska Legislature and express the majority's preference for the procedures afforded in one of the two available methods in the Alaska Statutes. Since both methods are permitted, it is not for this court to say that one is inherently superior to the other.

IV. Conclusion
For the reasons expressed above, I believe that the relinquishment used in this case is valid and therefore that the final order of termination is also valid. The majority has reached a contrary conclusion, but the natural *643 mother's unselfish act of ratifying the adoption has resulted in the adoption being affirmed, a result that I warmly endorse.
NOTES
[1] Pseudonyms are used to protect the privacy of those involved.
[2] Bennett v. Bennett, 6 P.3d 724, 726 (Alaska 2000).
[3] 25 U.S.C. § 1901(4), (5) (1978); In re Adoption of F.H., 851 P.2d 1361, 1364 (Alaska 1993).
[4] 25 U.S.C. § 1902 (1978).
[5] Id.
[6] 25 U.S.C. § 1913(a) (1978) states:

Where any parent or Indian custodian voluntarily consents to a foster care placement or to termination of parental rights, such consent shall not be valid unless executed in writing and recorded before a judge of a court of competent jurisdiction and accompanied by the presiding judge's certificate that the terms and consequences of the consent were fully explained in detail and were fully understood by the parent or Indian custodian.
[7] In contrast, courts apply a non-preferential, best-interests test outside the ICWA context when determining whether to return a child to a parent who has withdrawn consent to adopt; the child is not returned automatically to the parent. S.O. v. W.S., 643 P.2d 997, 1005 (Alaska 1982).
[8] In re Adoption of F.H., 851 P.2d at 1364 (quoting 25 U.S.C. § 1915(a) (1978)).
[9] Id.
[10] Id.
[11] Id.
[12] 44 Fed.Reg. 67583, 67594 (1979); C.L. v. P.C.S., 17 P.3d 769, 773 (Alaska 2001).
[13] In re Adoption of F.H., 851 P.2d at 1364. We also have held that "[w]hether there is good cause to deviate [from ICWA preferences] in a particular case depends on many factors including, but not necessarily limited to, the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement and the child's ties to the tribe." Id. at 1363-64.
[14] Through § 1903(1)(ii), ICWA applies to termination of parental rights. Arguably, a post-termination parental change in placement preference is meaningless as the parent's rights have been terminated. Nevertheless, we have relied on a parent's consistent preference, even after termination, for ICWA deviation. In re Adoption of F.H., 851 P.2d at 1365 ("Since signing [documents relinquishing parental rights], E.P.D. has consistently supported an adoption by the Hartleys.").
[15] Perry v. Newkirk, 871 P.2d 1150, 1153 (Alaska 1994) (citation omitted).
[16] AS 25.23.180(a).
[17] S.J. v. L.T., 727 P.2d 789, 796 (Alaska 1986).
[18] Id.
[19] AS 25.23.180(b)(1), (g).
[20] AS 25.23.180(b) (emphasis added).
[21] 379 N.W.2d 816, 817-18 (S.D.1985).
[22] Id. at 818.
[23] Id.
[24] K.W.E. v. People of the State of Colorado, 31 Colo.App. 219, 500 P.2d 167, 168 (1972).
[25] Id.
[26] Id.
[27] Id.
[28] Id.
[29] Concurrence at 636.
[30] 851 P.2d 1361 (Alaska 1993).
[31] 912 P.2d 1255, 1260 (Alaska 1996); concurrence at 636-637.
[32] 851 P.2d at 1365.
[33] Id. at 1364.
[34] Id. at 1365.
[35] Id. at 1362 & 1365.
[36] 912 P.2d at 1260.
[37] Id. at 1263 (italics and capitalization removed from section heading).
[38] The concurrence contends that conditional relinquishments are permissible because they are not expressly prohibited by our statutes. Concurrence at 632. Such reasoning contradicts our holding in S.J. v. L.T. that "in the absence of statutory authorization there can be no termination of parental rights and obligations." 727 P.2d 789, 796 (Alaska 1986). And there is no general statutory acknowledgment of conditional relinquishments. All of the concurrence's cited examples of when parents may withdraw a relinquishment or maintain some contact with the child despite a relinquishment are expressly established by statute.
[39] UNIF. ADOPTION ACT § 2-403 cmt., 9 U.L.A. 53 (1999).
[40] Id.
[41] Id.
[42] The concurrence argues that our two conclusionsthat a parent may not conditionally relinquish parental rights and that relinquishments may not be used in a private party adoption contextare unrelated. Concurrence at 638-639. However, the second point naturally follows the first. Relinquishments may, as a matter of practice, only be viable in private party adoption contexts if they allow the natural parent to condition the relinquishment on a particular person or couple adopting the child. In holding that relinquishments in private party adoption contexts are not viable, we are informed by the 1994 Uniform Adoption Act and its commentary. The concurrence takes issue with our reliance on the 1994 Act because Alaska's adoption law is based on the 1969 Uniform Adoption Act. But the relevant section and commentary from the 1994 Act do not change the substance of the 1969 Act, but simply clarify it: "This section helps clarify the distinction between consents and relinquishments and between direct and agency placements." UNIF. ADOPTION ACT § 2-403 cmt., 9 U.L.A. 53 (1999).
[43] 2 AM.JUR.2D Adoption § 60 (1994).
[44] AS 25.23.040-.060.
[45] Unlike this consent to adoption provision, the relinquishment statute makes no such provision for transfer of rights pending an adoption, an omission that compounds the problems with Andrea's purported conditional relinquishment. As the State points out in its amicus brief:

Allowing a parent to terminate his or her relationship with a child through a relinquishment to a prospective adoptive parent, or through a decree issued pursuant to a relinquishment, could result in termination of the biological parent's responsibilities toward the child, without the concomitant assumption of those responsibilities by the adoptive parent. That such a child would have no responsible parent or agency during the pendency of the adoption proceeding, or perhaps longer if the adoption were to fail, would contradict the state's policy to promote the best interests of its children.
[46] The concurrence correctly notes that we have disapproved of "permitting mere technical defects in consents to adoption to serve as a basis for disrupting familial ties and relationships that have developed in reliance on the validity of consents." S.O. v. W.S., 643 P.2d 997, 1002 n. 7 (Alaska 1982). Concurrence at 633. But we examine the function of the purported relinquishment precisely because we do not want technical defects to disrupt the child adoption process. And here, the defective relinquishment of parental rights functions as a consent to adoption.
[47] 643 P.2d 997, 1002 n. 6 (Alaska 1982).
[48] Id at 999.
[49] Id at 999-1000.
[50] Id. at 1000.
[51] Id. at 1000-01.
[52] Id. at 1002 n. 6.
[53] 25 U.S.C. § 1913(c).
[54] Delgado v. Fawcett, 515 P.2d 710, 712 (Alaska 1973) (citing In re Parks' Petition, 267 Minn. 468, 127 N.W.2d 548, 553 (1964)).
[55] The concurrence finds no public policy reason for prohibiting conditional relinquishments. But in D.M. v. State, Division of Family & Youth Services, we recognized that "parental rights are of the highest order." 995 P.2d 205, 212 (Alaska 2000) (internal quotation omitted). Our decision to disallow the circumvention of procedures in place to protect these rights promotes an important public policy.
[56] 851 P.2d at 1364.
[57] Id.
[58] Id.
[59] Id. at 1365.
[60] Thus, while the latest consent to adoption drafted by the Wilsons and executed by Andrea on September 9, 2003 contained new language indicating that "[v]isitation rights are not allowed, except as agreed by the [Wilsons]," addition of new terms to the adoption was beyond the scope of our limited remand to the superior court to allow Andrea to reaffirm her consent to the adoption. The January 17, 2002 adoption decree entered by Judge Reese, which we now affirm, expressly ordered that "the biological mother retains visitation rights which shall be set out in a separate order." Thus, the new language drafted by the Wilsons purporting to restrict Andrea's visitation rights has no effect on the open nature of the adoption previously approved by Judge Reese. Indeed, the open nature of the adoption provided one of the bases for Judge Reese's finding of good cause, as it did for the trial court in F.H. Judge Reese left open to a future hearing the actual nature of the contact between Keith and Andrea, and the scheduling of this contact should be addressed on remand.
[61] 851 P.2d at 1365.
[1] AS 25.23.180 provides in relevant part:

(a) The rights of a parent with reference to a child, including parental right to control the child or to withhold consent to an adoption, may be relinquished and the relationship of parent and child terminated in or before an adoption proceeding as provided in this section.
(b) All rights of a parent with reference to a child, including the right to receive notice of a hearing on a petition for adoption, may be relinquished and the relationship of parent and child terminated by a writing, signed by the parent, regardless of the age of the parent, a copy of which shall be given to the parent,
(1) in the presence of a representative of an agency taking custody of the child, whether the agency is within or outside of the state or in the presence and with the approval of a court within or outside of this state in which the minor was present or in which the parent resided at the time it was signed, which relinquishment may be withdrawn within 10 days after it is signed or the child is born, whichever is later; and the relinquishment is invalid unless it states that the parent has this right of withdrawal; or
(2) in any other situation if the petitioner has had custody of the minor for two years, but only if notice of the adoption proceeding has been given to the parent and the court finds, after considering the circumstances of the relinquishment and the long continued custody by the petitioner, that the best interest of the child requires the granting of adoption.
(c) The relationship of parent and child may be terminated by a court order issued in connection with a proceeding under this chapter or a proceeding under AS 47.10 on the grounds
(1) specified in AS 47.10.080(o) or 47.10.088;
(2) that a parent who does not have custody is unreasonably withholding consent to adoption, contrary to the best interest of the minor child; or
(3) that the parent committed an act constituting sexual assault or sexual abuse of a minor under the laws of this state or a comparable offense under the laws of the state where the act occurred that resulted in conception of the child and that termination of the parental rights of the biological parent is in the best interests of the child.
(d) For the purpose of an adoption proceeding under this chapter, a decree issued by a court of competent jurisdiction in this or another state terminating all rights of a parent with reference to a child or the relationship of parent and child dispenses with the required
(1) consent by that parent to an adoption of that child; and
(2) notice of a proceeding to that parent unless otherwise required by this section.
(e) A petition for termination of the relationship of parent and child made in connection with an adoption proceeding or in an independent proceeding for the termination of parental rights on grounds set out in (c)(3) of this section may be made by
(1) either parent if termination of the relationship is sought with respect to the other parent;
(2) the petitioner for adoption, the guardian of the person, the legal custodian of the child, or the individual standing in parental relationship to the child;
(3) an agency; or
(4) another person having a legitimate interest in the matter.
....
(g) Notwithstanding the provisions of (b) of this section, a relinquishment of parental rights with respect to a child, executed under this section, may be withdrawn by the parent, and a decree of a court terminating the parent and child relationship on grounds set out in (c)(1) and (2) of this section may be vacated by the court upon motion of the parent, if the child is not on placement for adoption and the person having custody of the child consents in writing to the withdrawal or vacation of the decree.
[2] UNIF. ADOPTION ACT. 9 U.L.A. 133 (1999).
[3] Compare AS 25.23.180 with UNIF. ADOPTION ACT § 19, 9 U.L.A. 216-18 (1999).
[4] See supra note 3 at § 11.
[5] 643 P.2d 997, 1002 n. 7 (Alaska 1982).
[6] Id.
[7] 951 P.2d 436, 441-42 (Alaska 1998).
[8] 690 P.2d 10, 14 (Alaska 1984).
[9] Id.
[10] 362 Mass. 842, 291 N.E.2d 729 (1973).
[11] Id. at 730.
[12] Id. at 730-31.
[13] Id. at 731 (internal citations omitted).
[14] Id. (internal citations omitted).
[15] See supra note 1.
[16] AS 25.23.120(c) & (d) provide:

(c) If at the conclusion of the hearing the court determines that the required consents have been obtained or excused and that the adoption is in the best interest of the person to be adopted, it may issue a final decree of adoption.
(d) If the requirements for a decree under (c) of this section have not been met, the court shall dismiss the petition and determine, in the best interests of the minor, the person including the petitioner to have custody of the minor.
[17] Id.
[18] See In re J.R.S., 690 P.2d 10, 14 (Alaska 1984).
[19] See Lacher v. Lacher, 993 P.2d 413 (Alaska 1999); Williams v. Crawford, 982 P.2d 250 (Alaska 1999); McGee v. McGee, 974 P.2d 983 (Alaska 1999); Lowe v. Lowe, 817 P.2d 453 (Alaska 1991); Schofield v. Schofield, 777 P.2d 197 (Alaska 1989); Foster v. Foster, 684 P.2d 869 (Alaska 1984).
[20] See State of Alaska, Dep't of Health & Social Servs, Div. of Family & Youth Servs. Policy & Procedure Manual § 3.9.1.h. This subsection provides:

When parents have relinquished their parental rights with the understanding that their child will be adopted by a specific person, the worker will notify them if the proposed placement fails. The requirement to notify the parents applies from the time of the relinquishment until the adoption is finalized, even after termination of parental rights. After receiving notice that the proposed placement has failed, a parent may notify the division, in writing, of a desire to withdraw the relinquishment. If the parent does not submit such notice to the division within 30 days of being notified of the failed placement, the division is not required to have any further contact with the parent. The parent's request to withdraw the relinquishment is not automatically granted. The Division decides whether to consent to the withdrawal or not, based on the circumstances of the case. Consents for withdrawal must be approved and signed by the Children's Services Manager.
[21] 912 P.2d 1255, 1260 (Alaska 1996).
[22] Id. at 1259.
[23] 851 P.2d 1361, 1362 (Alaska 1993).
[24] See 25 U.S.C. § 1915(a).
[25] In re Adoption of F.H., 851 P.2d at 1365.
[26] We stated:

Master Duggan recognized that F.H.'s situation would be uncertain if the Hartleys' adoption petition were dismissed and E.P.D. withdrew her conditional relinquishment. E.P.D.'s relinquishment was conditioned on the Hartleys' adoption of F.H.... The superior court properly considered F.H.'s situation if the adoption petition were dismissed. It was not clearly erroneous for the superior court to find that F.H.'s uncertain situation would have continued if the Hartleys were not allowed to adopt F.H.
Id. at 1365.
[27] 2B NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 49:06 at 94 (6th ed.2000).
[28] Id., § 49-07 at 99-100.
[29] AS 28.23.005.
[30] See RESTATEMENT (SECOND) OF CONTRACTS §§ 178 & 179 (1981). Section 178 of the RESTATEMENT provides:

(1) A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.
(2) In weighing the interest in the enforcement of a term, account is taken of
(a) the parties' justified expectations,
(b) any forfeiture that would result if enforcement were denied, and
(c) any special public interest in the enforcement of the particular term.
(3) In weighing a public policy against enforcement of a term, account is taken of
(a) the strength of that policy as manifested by legislation or judicial decisions,
(b) the likelihood that a refusal to enforce the term will further that policy,
(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and
(d) the directness of the connection between that misconduct and the term.
In Brown v. Baker, 688 P.2d 943, 948 (Alaska 1984), we employed these factors in order to determine whether a security agreement in a limited entry fishing permit was unenforceable.
[31] In re Termination of Parental Rights Over J.M.J., 379 N.W.2d 816 (S.D.1985); and K.W.E. v. People, 31 Colo.App. 219, 500 P.2d 167 (1972).
[32] Op. at 630.
[33] I discuss this reason below on pages 641-642.
[34] In re Adoption of a Minor, 362 Mass. 842, 291 N.E.2d 729, 731 (1973) (citations omitted).
[35] Op. at 628 & n. 42.
[36] Id.
[37] See 1994 Uniform Adoption Act §§ 2-402(a)(1); 2-403; 2-406(a)(5), UNIF. ADOPTION ACT, 9 U.L.A. 51, 53, 55 (1999).
[38] The 1994 Uniform Adoption Act "aims to be a comprehensive and uniform state adoption code" that "goes beyond existing statutory laws to create a coherent framework for legitimizing and regulating both direct-placement and agency-supervised adoptions." Prefatory Note to 1994 Uniform Adoption Act. UNIF. ADOPTION ACT, 9 U.L.A. 12, 14 (1999). Notwithstanding footnote 42 in today's opinion, § 2-403 of the 1994 act does not purport to clarify the 1969 Uniform Act. That section, in full, provides: "A parent or guardian whose consent to the adoption of a minor is required by Section 2-401 may relinquish to an agency all rights with respect to the minor, including legal and physical custody and the right to consent to the minor's adoption." Instead, this section is simply a part of the comprehensive new act. Likewise, the commentary to § 2-403 neither addresses nor purports to clarify the 1969 Uniform Act. Instead, it explains the objectives and operation of the new act. It states, in full:

This section helps clarify the distinction between consents and relinquishments and between direct and agency placements. A parent or guardian who makes a direct placement of a minor for adoption must execute a consent for the adoption to go forward. If the parent or guardian prefers, instead, to have an agency place the minor and consent to the minor's adoption, the parent or guardian has to relinquish all rights with respect to the minor to the agency. From then on, the agency acts in lieu of the parent or guardian: it acquires custody of the minor and the authority to place the child for adoption pursuant to the procedures in Sections 2-103 and 2-104. An agency may also acquire the right to place the minor for adoption pursuant to a court order.
UNIF. ADOPTION ACT, 9 U.L.A. 53 (1999).
[39] (Emphasis added.)
[40] An example of a defective relinquishment in favor of a private individual can be seen in S.O. v. W.S., 643 P.2d 997, 1000 (Alaska 1982).
[41] AS 25.23.040-.130; AS 25.23.130(a)(1) (effect of adoption decree is to terminate "all legal relationships between the adopted person and the natural parents").
[42] AS 25.23.180; AS 25.23.050(a)(4) (consent to adoption not required of parent who has relinquished right to consent under AS 25.23.180); AS 25.23.050(b) (notice of hearing on a petition for adoption not required to a person whose relinquishment has been filed with the petition).
[43] AS 25.23.070(b). ICWA changes the period of withdrawal as a matter of right in consent track cases to the final decree of adoption. 25 U.S.C. § 1913(c).
[44] AS 25.23.180(b)(1). ICWA changes the period under which a relinquishment may be withdrawn as a matter of right to the final decree of termination. 25 U.S.C. § 1913(c).
[45] AS 25.23.060(a).
[46] AS 25.23.180(b)(1); see Adoption Rule 9(d).
[47] AS 25.23.180(b)(2).
[48] The Affidavit of Robert B. Flint, a member of the American Academy of Adoption Lawyers, who has practiced adoption law in Alaska for the better part of three decades, states in part:

I have routinely obtained decrees of termination of parental rights in private adoptions over the years of my adoption practice. Such decrees have always been obtained under AS 25.23.180(b). No court has ever questioned the statute's applicability to private adoptions nor has the Adoption Rules Committee.
Based on my actual experience and belief the use of AS 25.23.180(b) is a normal and accepted practice in private adoptions.
The Affidavit of Mary Ellen Ashton, former Probate Master for the Third Judicial District, and currently an attorney specializing in adoptions, states:
As Probate Master I approved [decrees of termination] under AS 25.23.180(b) in private adoptions where the petitioners were private parties.
I have practiced law since 1991 largely in the field of adoption. I have handled over 1000 adoption cases since that time including private adoptions. As appropriate I have used AS 25.[23].180(b) to obtain decrees of termination of parental rights in private adoption.
I am a member of the Adoption Rules Committee appointed by the Court. At no session of the Committee has it been suggested that AS 25.23.180(b) is limited to agency adoptions.
It is my belief that the use of AS 25.23.180(b) for termination in private adoptions is acceptable practice and has been for many years.
[49] 851 P.2d 1361, 1362 (Alaska 1993).
[50] Id. at 1362, 1365.
[51] 643 P.2d 997, 1000 (Alaska 1982). But the relinquishment used in that case was ineffective because it was not signed before an agency or with the approval of a judge. Id.
[52] Op. at 630. Actually the period of withdrawal as a matter of right is identical under both tracks provided by state law: ten days after signature. The difference lies in withdrawal by leave of court upon a finding that withdrawal is in the best interest of the child. This type of withdrawal is specifically provided under the consent track, AS 25.23.070(b), but not under the relinquishment track. But in either case the court must still, before approving an adoption, find it to be in the best interest of the child, AS 25.23.120(c), and when this requirement is not met, the court must dismiss the adoption and proceed to determine based on the best interest of the child who should have custody of the child. AS 25.23.120(d).
[53] Compare AS 25.23.180(b)(1) & (2) with AS 25.23.060.
[54] Op. at 630 & n. 55.
[55] See 1994 Uniform Adoption Act §§ 2-408, 2-409, UNIF. ADOPTION ACT, 9 U.L.A. 60-63 (1999).
[56] See, e.g., AS 25.23.005.
[57] By contrast the 1994 Uniform Adoption Act only allows revocation as a matter of right within 192 hours after birth. See supra note 55. Thus although the majority seems to be saying in part that a longer period than ten days for the withdrawal of consents or relinquishments is good public policy, the current thinking of the commissioners on uniform state laws appears to be that a shorter period, or no period if the child is more than eight days old, is appropriate.