**In the Matter of the TERMINATION
OF PARENTAL RIGHTS
OVER J.M.J.**

**No. 14672.**

Supreme Court of South Dakota.

On Rehearing Sept. 13, 1985.

Decided Dec. 18, 1985.

Rehearing Denied Jan. 27, 1986.

Ronald D. Campbell, Asst. Atty. Gen., Pierre, for appellee State; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Forrest C. Allred, Aberdeen, for appellant mother.

HERTZ, Acting Justice.

This action pertains to the permanent termination of the parental rights of a mother, D.J., to her child, J.M.J. It arises from an appeal which restored D.J.'s parental rights over her child. We affirm.

This case is before us on the State of South Dakota Department of Social Services petition for rehearing. The procedural and factual background is chronicled in, *Matter of J.M.J.*, 368 N.W.2d 602 (S.D. 1985), and is synopsized as follows.

At a hearing conducted on December 13, 1982, D.J. voluntarily terminated her parental rights over her daughter, J.M.J. During the course of the proceedings, D.J. testified that she understood she was asking the court to irrevocably terminate her parental rights. She had no reservations about what she was doing, however, D.J. further understood that following the termination, J.M.J. would be placed for adoption with D.J.'s sister and brother-in-law in Arizona. Before the hearing was concluded, the judge informed the mother that he did not have authority to order where the child would be placed for adoption and that after custody was vested with Social Services, the court's jurisdiction would end.

The court thereafter ordered D.J.'s parental rights terminated and J.M.J. was placed in the custody of the Department of Social Services. Pursuant to the court's order, it was adjudged that Social Services place the child with her aunt and uncle, Pam and Daryl Filipek, if at all possible. The Department did in fact transfer J.M.J. to Arizona to live with her relatives, however, subsequent marital problems forced the Filipeks to request that J.M.J. be removed from their home. The Department brought J.M.J. back to South Dakota on March 31, 1984, at which time D.J. petitioned the trial court to vacate the order terminating her parental rights. This petition was denied.

Thereafter, D.J. appealed to this court which reversed the trial court's order and thereby, restored D.J.'s parental rights over her daughter. A full rehearing was granted upon new evidence which illuminated the fact that J.M.J. was placed with an adoptive family on August 9, 1984, one month after notice of appeal had been filed. Adoption was finalized on April 2, 1985.

These facts were not made known to the court when it initially decided *Matter of J.M.J., supra.* The adoption record has been ordered included in the record upon rehearing.

■ At the outset, it cannot be overemphasized that voluntary termination proceedings under SDCL Ch. 25–5A bring parental rights to a complete and unequivocal end. Pursuant to SDCL 25–5A–16, it is incumbent upon the trial court to determine that the parents are fully aware of the purpose of the proceedings and the consequences of their actions.

The following testimony by D.J. given at the hearing on her petition for the voluntary termination of her parental rights, is pertinent to our discussion:

Q. Do you understand that this petition which you will be signing, that in that, you are asking the court to end your parental rights to the child forever?

A. Yes.

Q. And you understand that the child is going to be placed with, and is with your sister in Arizona, and they will adopt the child?

A. Right.

Q. And Social Services has assured you that the child will be adopted by that family, and that is one of the conditions why you are consenting to termination?

A. Yes.

■ The foregoing questions were propounded by D.J.'s trial counsel. Additionally, her trial counsel prepared the Findings of Fact and Conclusions of Law and the Order terminating her parental rights dated December 29, 1982. In the findings, the court expressly found that D.J. was advised that the execution of the consent to terminate is irreconcilable, final and conclusive. The Order entered by the trial court directed the Department of Social Services to place the child for adoption with the Filipeks "if at all possible."

We are satisfied that the Department fulfilled its obligation under the Order by attempting to place J.M.J. with her aunt and uncle for adoption. That the child's placement and anticipated adoption failed is not the fault of Social Services. Consonent with Chief Justice Fosheim's dissent in *Matter of J.M.J., supra,* "These were possible contingencies which must reasonably have been anticipated at the termination hearing—no assurances to the contrary could have been made as a matter of law."

The trial judge, at the close of D.J.'s testimony, stated, "It's the court's understanding—I don't believe I have the authority to order that. I would place custody with Social Services, and, after that, my jurisdiction would end." It is obvious that D.J.'s trial counsel clearly understood from the court's statement that there was to be an irrevocable termination of parental rights and that, consistent with D.J.'s request, the Department of Social Services would be directed to proceed with the adoption of J.M.J. by the Filipeks. We are satisfied that D.J. understood the effect of the trial court's order in the same manner as did her own counsel.

By reiteration, there can be no conditional relinquishment of parental rights under our statutes. It follows, therefore, that D.J.'s request to have J.M.J. placed for adoption with the Filipeks cannot in any way be characterized as a condition, the nonfulfillment of which, is fatal to D.J.'s consent to termination of her parental rights. At the original hearing, D.J.'s testimony indicated that she understood that her child would never be returned to her. We are satisfied that the trial court did everything necessary to make D.J.'s decision well considered. To that end, Social Services attempted placement of the child in Arizona as ordered by the trial court. The subsequent failure of this endeavor was completely beyond their control.

■ As previously noted, J.M.J. was placed for adoption on August 9, 1984. The adoption became final on April 2, 1985.

J.M.J. has been residing with her adoptive family for over one year. The Department of Social Services has admitted error in proceeding with the adoption after notice of appeal had been filed. D.J. argues that the Department should not be rewarded for committing such a grievous error. We, most certainly, do not condone the actions of the department, at the same time, we do not perceive it to be intentionally done to circumvent D.J.'s parental rights. We now are confronted with the paramount concern of this court, and that is the best interest and welfare of the child. It is now not a question of rewarding the department, but rather what is best for J.M.J. We hold that the best interest and welfare of J.M.J. is best served by permitting her to remain with her adoptive parents.

It is well known that children need stability and continuity in their lives. In a contest concerning the custody of a minor child, the best interests and welfare of a child are of paramount and controlling interest. *Sweeney v. Joneson,* 75 S.D. 213, 216, 63 N.W.2d 249, 251 (1954). Although parents have a fundamental right to their children, it is not an absolute and unconditional one. *In Re K.D.E.,* 87 S.D. 501, 506, 210 N.W.2d 907, 910 (1973). The State of South Dakota, as *parents patriae,* takes necessarily strong interest in the care and treatment of every child within its borders. *Matter of N.J.W.,* 273 N.W.2d 134, 137 (S.D.1978). As such, parental rights are not paramount to children's rights, and must give way to accommodate the best interests of the child which must always prevail. *In Re A.I.,* 289 N.W.2d 247, 249 (S.D.1980).

Germane to this issue is J.M.J.'s adoption record. This document is replete with information concerning D.J. and the adoptive family in regard to parental fitness. The record contains, among other things, an evaluative report to the Third Circuit Court in which the investigator described J.M.J. as a bright and outgoing child who has made many friends, is doing well in school, and has adjusted easily to her new family. She takes dance and piano lessons. The adoptive father is a field engineer while his wife's primary occupation is that of wife, mother and homemaker. The adoptive parents report that the bonding they feel with J.M.J. is strong, reciprocated, and that she has assimulated well into their family.

By contrast, D.J. has a long history of mental and emotional problems. J.M.J. was born out of wedlock. Her alleged father denied paternity and has never made contact with the child. His parental rights were terminated pursuant to court order dated October 21, 1983. Pertinent to this matter are Chief Justice Fosheim's dissenting statements in *Matter of J.M.J., supra,*

> We can assume that the termination decision ultimately rested on the neglect of the mother rather than the voluntary or involuntary nature of the petition. Before the mother came forward with a voluntary termination petition, the Department had commenced a dependency and neglect action against her. The primary significance of the voluntary petition therefore was its indication that the mother was not disputing the claims of child neglect, alleged by the Department.

Public policy dictates that decisions affecting children should be final. Finality is particularly important in the sensitive area of termination cases. Once the termination is final, a child such as J.M.J. may have the opportunity to find stability with an adoptive family. In *In Re Magee,* 74 S.D. 286, 290, 52 N.W.2d 99, 100 (1952), the child had lived with the adoptive parents for over six months but the adoption was not yet finalized. Shortly thereafter the natural mother petitioned for leave to withdraw her consent, and to have the baby restored to her. In denying the mother's petition, the court found significant evidence of the mother's emotional instability. Thus, the court found that it would be in the child's best interest to remain with the adopted family with whom the child had adjusted well and was ideally situated. In the instant case, it appears contrary to J.M.J.'s best interests to be uprooted from her present environment, especially in view of the natural attachment she has formed with her new family.

In *Matter of J.M.J., supra,* the concurring Justices indicated that had J.M.J. been adopted out or placed in pre-adoption foster care, they would not have restored D.J.'s parental rights. Thus, in balancing D.J.'s rights with the State's duty as guardian of neglected and dependent children, due consideration must also be given to the subsequent adoption as it affects the rights of J.M.J. and her adoptive parents.

Therefore, in light of the child's subsequent adoption and the new evidence which revealed the natural mother's history of emotional instability and the relative stability of the adoptive home, we find that D.J.'s parental rights must yield to the best interests of the child who shall remain as presently situated in the adoptive home.

We accordingly affirm the trial court.

FOSHEIM, C.J., MORGAN, J., and WUEST, Circuit Judge, acting as a Supreme Court Justice, concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

I respectfully dissent.

In order for parental relations to be voluntarily terminated under SDCL ch. 25–5A, the circuit court must make a full and complete inquiry and determine that the parents are fully aware of the purpose of the proceedings and the consequences of their act. *See* SDCL 25–5A–16 and SDCL 25–5A–18. A partial or conditional termination of parental rights, however, is not within the purview of SDCL ch. 25–5A, *Matter of J.M.J.,* 368 N.W.2d 602, 606 (S.D. 1985), and once a condition is expressed, the circuit court should immediately terminate the proceedings because "the permanent termination of parental rights may not be conditioned in any manner." *J.M.J., id.* at 608 (Wollman, J., concurring specially).[1] *See also, K.W.E. v. People,* 31 Colo.App. 219, 500 P.2d 167 (1972).

In *J.M.J.,* based on the mother's (D.J.'s) testimony at the voluntary termination hearing, a small portion of which is reiterated in the majority opinion herein, it was concluded that "the mother 'conditioned' her consent to relinquishment of her child[,]" *id.* at 606; that the "condition imposed by the mother was the antithesis of a consent to an absolute termination of the custody of her child[,]" *id;* that the mother "was conditioning her consent upon the fact that the child would be adopted by her sister[,]" *id.* at 608 (Wollman, J., concurring specially); and that it was "obvious that her consent was part of a family plan to have her child adopted by her sister and brother-in-law, which plan fell through by no fault of the mother[.]" *Id.* at 608 (Morgan, J., concurring in result).

Now, however, the majority herein, less than seven months after the rendition of the decision in *J.M.J.,* and seemingly based on the same voluntary termination testimony reviewed in *J.M.J.,*[2] concludes that the mother's "request to have J.M.J. placed for adoption with the Filipeks cannot in any way be characterized as a condition, the nonfulfillment of which, is fatal to [the mother's] consent to termination of her parental rights."[3]

From such a determination, I dissent. At the voluntary termination hearing held in December 1982, the mother testified as follows:

Q. [by Mother's trial counsel] And you understand that the child is going to be placed with, and is with your sister in Arizona, and they will adopt the child?

A. [by Mother] Right.

Q. *And Social Services has assured you that the child will be adopted by that family, and that is one of the conditions why you are consenting to termination?*

A. *Yes.*

\*　　\*　　\*　　\*　　\*　　\*

---

1. Justice Wollman is now serving on the Eighth Circuit Court of Appeals. Thus, this Court is comprised of different personnel.

2. There has been no further testimony taken on the voluntary termination issue.

3. The author of the majority opinion is Hertz, Circuit Judge, Acting as Supreme Court Justice. Acting Justice Hertz was not a participant in *J.M.J.,* 368 N.W.2d 602.

Q. [by Mother's trial counsel] Do you understand that when this order is entered, it is irrevocable; that if you want to change your mind, it's all over?

A. [by Mother] I know. *But what would happen if Social Services says she is definitely going to go to my sister, and they turn around and—*

Q. It's my understanding that that will be in the order.

\* \* \* \* \* \*

*[D]o you understand that the child will be placed with your sister for adoption, and that that is the only condition[4] you are placing on this relinquishment?*

A. *Yes.*

[by the State] *That's the State's understanding also.*

THE COURT: It's the Court's understanding—I don't believe I have the authority to order that. I would place custody with Social Services and, after that, my jurisdiction would end—

[by Mother's trial counsel] I will put Social Services on the stand. Do you have any other questions, [D.J.]?

A. [by Mother] I want to make sure she is placed with the family.

*J.M.J., id.* at 604–05 (emphasis in original; footnotes omitted). To now determine the above testimony to be a mere "request" that "cannot ... be characterized as a condition" which vitiates the mother's consent to termination of her parental rights, is a grievous misinterpretation and misreading of the record and the testimony therein. This new conclusion, this new interpretation, this new reading of the mother's intentions and testimony appear to be solely anchored to the premise that the child had been placed with an adoptive family on August 9, 1984 (one month after notice of appeal had been filed), and the adoption was finalized on April 2, 1985 (just 55 days after this Court considered the appeal on briefs and 50 days before a formal decision

thereon was rendered). I posit that such subsequent events cannot transform the conditioned assent of the mother to the termination of her parental rights into a well-considered and unequivocal decision on her part. The mother's condition to voluntary termination, clearly and repeatedly stated and expressed at the termination hearing, was a state of mind then existing and it cannot now be changed by totally unrelated acts which have transpired nearly two and one-half years thereafter. At the time when the circuit court was required by SDCL 25–5A–16 and SDCL 25–5A–18 to make a full and complete inquiry and determine that the mother was fully aware of the purpose of the .proceedings and the consequences of her act, the mother conditioned her consent; the egregious error of the Department of Social Services, which permitted adoption while this Court was considering the mother's appeal, does not eliminate or change that conditioned consent. Having received less than full and complete consent to the voluntary termination of the mother's parental rights, the circuit court could not proceed to terminate those rights under SDCL ch. 25–5A.[5]

Parents have a fundamental right to their children. *Matter of Adoption of Bellows,* 366 N.W.2d 848 (S.D.1985); *In re K.D.E.,* 87 S.D. 501, 210 N.W.2d 907 (1973). Although the majority paints a bright and happy picture of J.M.J. and her new adoptive parents, and a dark and doubtful scenario surrounding the mother, I do not believe such circumstances and the child's best interest warrant the termination of the mother's natural and fundamental parental rights. The record is not replete with grounds for which the mother could lose her parental rights involuntarily and thus have her child taken from her by the State. It is cardinal to observe that her rights to the child were not terminated by an involuntary proceeding below. The fact that the mother voluntarily and conditionally terminated her parental rights and that the condition did not transpire, cannot es-

---

4. "Condition" is used in the question; the majority opinion says this cannot be "characterized as a condition."

5. Mother was innocent of the Department's wrongdoing. Laches or estoppel should not be applied against her.

top the mother from asserting her natural and fundamental parental rights. Nor can the Department of Social Services' error be used as a vehicle, avenue, or means by which the mother loses her child. While the Department of Social Services should most certainly not be rewarded for committing the error hereinbefore mentioned, neither should the mother be punished and emotionally traumatized because of the results occurring therefrom. When the mother's sister and brother-in-law did not adopt the child and the child was returned to South Dakota, the mother moved expeditiously to regain the custody of her child. Furthermore, this Court has held that a parent may validly withdraw his/her consent to adoption under proper circumstance. *Matter of Adoption of Everett,* 286 N.W.2d 810 (S.D.1979). *In Matter of D.D.D.,* 294 N.W.2d 423, 426 (S.D.1980), this Court remanded a case to the lower court with instructions to determine the voluntariness of a natural father's waiver of notice and power of attorney to consent to the termination of his parental rights over an illegitimate child. As I expressed in a special concurrence in *Matter of Adoption of Sichmeller,* 378 N.W.2d 872, 874 (S.D.1985): "A proceeding for voluntary relinquishment, which is the way this case started out, is intended to provide only for the parental relinquishment of unwanted children, not for the relinquishment of children who are genuinely wanted by a parent." *Id.* at 875. I also cited with approval, for it is a work of humanity—not technicality—, *In re Romero,* 73 S.D. 564, 568, 46 N.W.2d 108, 110 (1951). *Id.* No act of the mother thus creates error or estoppel and I would affirm the previous decision rendered in *J.M.J.,* 368 N.W.2d 602.

I find no fault with the trial court which proceeded with the adoption and which adoption file, by order of this Court, was made a part of this appeal record. Little did the trial court realize, when it granted this ten-year-old girl to new parents, that the rights of the mother and the child were on appeal; for, this state agency filed a written document dated April 2, 1985, consenting to the adoption of the child. This agency, in a Report to the Court, dated March 18, 1985, told the adopting court that the "biological mother's rights were terminated December 28, 1982 and the Order was filed." Therefore, the adoption order was entered without knowing that the case was on appeal and an adoption order was entered when the rights of the mother had not been finally terminated. Thus, the adoption order was flawed. Justice Fosheim, writing for this Court in *Everett,* 286 N.W.2d at 816, closed by stating: "The only procedure by which the Oaklands could have adopted the child without Ms. Everett's consent was under the provisions of SDCL 25–6–4, none of which were applicable." SDCL 25–6–4 was cited in its entirety. I refer to subsection 4, which is particularly applicable to this case. Please note SDCL 25–6–4(4), which reads:

No child may be adopted without the consent of his parents. However, the judge may waive consent from a parent who:

\* \* \* \* \* \*

(4) Has been judicially deprived of the custody of the child, *if the adjudication is final on appeal to the court of last resort* or the time for an appeal has expired. (Emphasis supplied.)