#26267-a-JKK

**2013 S.D. 45**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF THE
TERMINATION OF PARENTAL RIGHTS OF
JESSICA L. IBANEZ OVER
K.S.M., K.L.M. and D.F.M., MINOR CHILDREN

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE  SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE KATHLEEN K. CALDWELL
Retired Judge

\* \* \* \*

JASON R. SUTTON
THOMAS J. WELK of
Boyce, Greenfield,
  Pashby & Welk, LLP
Sioux Falls, South Dakota          Attorneys for appellant
                                   Jessica L. Ibanez.


CLINT L. SARGENT
RALEIGH HANSMAN of
Meierhenry & Sargent, LLP
Sioux Falls, South Dakota          Attorneys for appellees
                                   Jared and Amy Miller.

\* \* \* \*

ARGUED ON MARCH 19, 2013

OPINION FILED **06/26/13**

#26267

KONENKAMP, Justice

[¶1.] In seeking to set aside her voluntary termination of parental rights, a mother alleged "fraud upon the court" because she was "secretly paid monetary consideration" and given "unenforceable secret promises" of continued visitation with her children, all of which were not disclosed in the step-parent adoption proceedings. The circuit court denied relief and she appeals.

**I.**

[¶2.] Jessica Ibanez, the mother, was born in El Salvador in 1978. When she was four years old, her family moved back to South Dakota. She grew up here, attended Northern State University, and obtained a degree in International Business. It was at Northern State that she met Jared Miller. They married on May 27, 2000. They had three girls: K.S.M., K.L.M., and D.F.M.

[¶3.] Jessica stayed home with their daughters while Jared worked. They enjoyed an upper-middle class lifestyle. In 2006, Jessica learned that Jared was having an affair. He moved out and began divorce proceedings. His attorney was Steven Siegel, who would later become a witness. Jessica chose to proceed without counsel. She later explained that she trusted Jared and his family for advice and support during the divorce. Jared's family, she recalled, had told her that she need not hire a lawyer because she "would be taken care of." In a letter, Attorney Siegel advised Jessica that he was not her lawyer and that she should hire her own.

[¶4.] In January 2007, the parties stipulated to the terms of the divorce. But the stipulation was rejected by the circuit court because it failed to address alimony for Jessica. A second stipulation was approved, when it changed a $21,000

property settlement for Jessica into a $21,000 lump sum alimony payment. Jessica received custody of the children. She was permitted to stay in the marital home, but was required to pay rent and utilities.

[¶5.]        After the divorce, Jessica worked various jobs, but could not maintain consistent employment and never earned an annual salary of more than $30,000. Some of her jobs required travel, which made it difficult for her to spend time with her daughters. At some point, diagnosed with depression and suffering "emotional difficulties," Jessica found herself "financially bankrupt." She asked Jared to share custody of the children. Attorney Siegel drafted a third stipulation wherein Jared received physical custody. Jessica thought at the time that this arrangement would only be temporary while she got her life in order.

[¶6.]        In June 2008, Jared married Amy, the woman with whom he had had the affair. In Jessica's perception, Jared and Amy belittled her and tried to make her feel inadequate. And Jessica began to suffer decreased access to her girls. Her situation became more difficult when, in 2009, Jared sought child support. After a hearing, she was ordered to pay $463 per month, effective September 1, 2009. She fell behind on her payments, and with delinquent child support, her insurance license, necessary for her work, could not be renewed.

[¶7.]        Jessica met with Amy and Jared at a coffee shop. Their purpose was to discuss whether Jessica would terminate her parental rights so that Amy could adopt the girls. They would later disagree on whose proposal it was, but, regardless, after the meeting, their joint plan was for Jessica to terminate her parental rights; Jared would forgive her past-due child support; and Jessica and her

parents would have visitation with the children. At that time, Jessica was dating a man living in Austin, Texas, and believed it best for herself to move there. Multiple emails, admitted in evidence, reflect these arrangements.

[¶8.]     On November 3, 2009, Attorney Siegel sent a letter to Jessica "to outline the terms of future visitation" for her and her parents. He wrote that Jared and Amy would "agree to let you know about the activities and events going on in the girls' lives, and they will send you pictures and information now and again to keep you updated." As for Jessica's parents, Jared and Amy found "unrealistic" Jessica's proposal to allow them visitation for one week a summer. But it was agreed "to let the girls visit [Jessica's] parents for one weekend in the summer." The letter also provided: "As you know, terminating your parental rights means terminating all birth family rights as well." On the subject of child support, Attorney Siegel warned: "If you do not agree with any of the terms listed above, you, of course, are not required to terminate your parental rights. We will simply go back to the original child support Order, and you will have to start paying child support to your girls. It is entirely up to you." Following this letter, Jessica and Amy exchanged more emails about Jessica's visitation with the children.

[¶9.]     On December 8, 2009, Jessica went to Attorney Siegel's office and signed a petition to voluntarily terminate her parental rights. In an accompanying affidavit, she attested: "I still believe it to be in the best interests of my children to remain with their father and to be adopted by his wife, Amy L. Miller, and for my parental rights to be terminated." Further, she declared, "The motivation to terminate my parental rights is voluntary and without the undue influence of

others and I am not under the influence of any substance which affects my judgment." "I understand," she acknowledged, "that the termination of my parental rights is permanent and cannot be reversed even if, for example, I should change my mind."

[¶10.]     After Jessica executed these documents in December 2009, but before the termination hearing scheduled for February 2010, Jessica had regular contact with her daughters, including a birthday party thrown by Jessica and her parents. She also had weekly phone calls and an exchange of letters with the children.

[¶11.]     Two weeks before the scheduled hearing, Jessica emailed Jared and Amy from Texas, saying, "I will not show up at the hearing . . . if I do not have a letter prior to the hearing stating that you will not be seeking past child support. . . . I want it in my possession prior to the hearing or I will not even bother booking an airline ticket. I have placed trust in you too often and nothing good has come of it." The next day Attorney Siegel sent a letter to the South Dakota Division of Child Support indicating that "Jared and Amy Miller will agree to you closing your file . . . as long as Judge Tiede signs both the Termination and Adoption Orders at the hearing[.]"

[¶12.]     On February 24, 2010, Circuit Court Judge Stuart Tiede presided in a hearing on Jessica's petition to terminate her parental rights. Indicating that he was required to "make certain" that Jessica "is doing this for the proper reason and not for improper reasons," Judge Tiede asked Jessica to explain why she believed termination was in her children's best interests. Jessica testified:

> Well, I recently relocated to Texas, and Amy has been an
> instrumental part of their life for the last four years. She's - -

essentially, she stays at home with them. She raises them. She is the mother figure in their lives. And I think in the best interests of everybody here, including my children, it's important to them that - - and it's important to me and to Amy that she have some sort of rights, and I am in Texas. She's the mother and we have a pretty great relationship as far as it can go, and I just want my kids to have a stable home and Jared and Amy provide that.

[¶13.] After she told the court she was living with a boyfriend in Texas, the court asked, "So no one is threatening or forcing you to do this." Jessica replied, "Of course not, no." Under further questioning, she said that she was not under the influence of any drugs and had no addiction issues. She indicated that she was a college graduate. At the conclusion of the hearing, the court ruled that Jessica was competent: "She is well spoken. She's educated. I don't think that this decision has been entered into lightly. I think that she has made a reasonable and informed decision that in her mind this is in the best interests of her minor children."

[¶14.] That same day, the court signed written findings of fact and conclusions of law. It found that Jessica "properly appeared and voluntarily consented to the termination of her parental rights" and "no compulsion, coercion or force" had been used against her. The court further found that it would be in the best interests of the children for Jessica's rights to be terminated and, accordingly, ordered permanent termination and release from all financial responsibilities to the children "including child support obligations[.]" Thereafter, the court entered an order and judgment declaring the girls to be the adopted children of Amy L. Miller.

[¶15.] For a few months after the February 2010 termination hearing, phone calls, letters, and contact with the children proceeded essentially as agreed. Matters abruptly changed when, in May, Jared and Amy decided that Jessica's calls

to their home became "harassing" and it was no longer in the children's best interests to have continued contact with her.[1] Thereafter, Jared and Amy blocked Jessica's phone calls and cut off visitation for both Jessica and her parents.

[¶16.] Jessica retained counsel and, in February 2011, moved to vacate the judgment terminating her parental rights. A hearing was held in December before Circuit Court Judge Kathleen Caldwell. Attorney Siegel, Jessica, and Amy testified. Jessica said that she was unaware that by terminating her parental rights she would no longer be able to see or talk to her children despite Jared and Amy's agreement otherwise. She insisted that she would not have terminated her parental rights had she known that she would never have access to her children again. Jessica said she did not "realize that the promises that they [Jared and Amy] were making me as far as visitation had no legal weight[.]" She also testified that when she agreed to give up her parental rights, she was in a financial bind and could not afford the child support. Her attorney argued that the forgiveness of past-due child support was not disclosed to Judge Tiede and had not been approved in court as required by law.

[¶17.] In denying Jessica's motion to vacate, the court found that it was Jessica's idea to terminate her parental rights and that she understood she was terminating all birth family rights. "No promise of an express visitation schedule,"

---

1. Judge Caldwell found that the visitation ended when Jessica "took the children out-of-state without Jared and Amy's permission and did not return the children at the time promised." But this incident occurred a year later after Jessica filed her petition to vacate, and Jared and Amy then had a change of heart about denying the children contact with Jessica.

the court found, "was made . . . to get [Jessica] to terminate her parental rights." The court found significant a series of emails between Jessica and Amy three months before the termination hearing in which Jessica had then aggressively asserted her right to visitation. But these assertions, the court concluded, were made during a time when Jessica had temporarily changed her mind about giving up her parental rights. For the court, this was compelling evidence that Jessica, despite her contrary claims, well understood that she would have little ground to stand on for visitation rights if she decided to go through with the termination. In regard to Jared's promise to forgive Jessica's past-due child support, the court found that it "was not done for an improper motive or purpose, but rather is a common component of parental right termination proceedings."

[¶18.] Ultimately, the court ruled that Jessica failed to establish exceptional circumstances warranting relief under SDCL 15-6-60(b) — no fraud was committed upon the court and there was no suppression of information in the proceedings before Judge Tiede.[2] It also concluded that "the best interests of the children" constituted an "intervening equity" as it would be unfair "to undo Amy's adoption of the children, who now consider her their mother and call her 'Mom.'" The children were then ages ten, nine, and six.

---

2.    South Dakota's adoption annulment statute provides: "Except in any case involving fraud[,] . . . any proceeding for the adoption of a child . . . shall be in all things legalized, cured, and validated one year after the proceeding is finalized[,]" apparently permitting fraud claims to be raised indefinitely. *See* SDCL 25-6-21.

[¶19.]     On appeal, Jessica asserts abuse of discretion on the denial of her motion to vacate the final judgment because (1) Jared and Amy secretly gave her monetary consideration as part of the adoption and termination proceedings by forgiving her past-due child support; and (2) the undisputed evidence established that the parties made an unenforceable, secret promise for post-adoption contact between the children and Jessica and her parents. Both these actions, Jessica contends, were a "fraud upon the court" under SDCL 15-6-60(b).

## II.

[¶20.]     Our standard of review in this case is crucial. Granting or denying Rule 60(b) relief is a matter of discretion and equitable principles apply. *Hrachovec v. Kaarup*, 516 N.W.2d 309, 310-11 (S.D. 1994).[3] In deciding on such relief, courts must strive to maintain the difficult balance between finality and justice. *See In re T.M.B & M.A.D.*, 416 N.W.2d 260, 263 (S.D. 1987). And "intervening equities" may defeat an otherwise legitimate claim for relief. *Id.*; 11 Charles A. Wright, et al., *Federal Practice & Procedure* § 2857 (3d ed. 2013). On appeal, we review the circuit court's decision to deny relief for an abuse of discretion. *Walsh v. Larsen*, 2005 S.D. 104, ¶ 6, 705 N.W.2d 638, 641 (citations omitted). While the phrase "'abuse of discretion' defies an easy description" and its application remains contextual with the nature of the case, it is generally understood as "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on

---

3.     A motion to set aside a judgment as "void" under SDCL 15-6-60(b)(4) may be an exception and require de novo review since judgments "are by definition either legal nullities or not." *Carter v. Fenner*, 136 F.3d 1000, 1005 (5th Cir. 1998).

full consideration, is arbitrary or unreasonable." *Arneson v. Arneson,* 2003 S.D. 125, ¶ 14, 670 N.W.2d 904, 910.

[¶21.]     In both issues for review, Jessica asserts "fraud upon the court" as the basis for relief under SDCL 15-6-60(b).[4]  Distinct from fraud between parties, "fraud upon the court" encompasses only that species of fraud which "defile[s] the court itself." *Reaser v. Reaser,* 2004 S.D. 116, ¶ 19, 688 N.W.2d 429, 435 (citation omitted).  "[T]o set aside a judgment or order because of fraud upon the court under Rule 60(b), . . . it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision." *Gifford v. Bowling,* 86 S.D. 615, 625, 200 N.W.2d 379, 384 (1972) (citation omitted) (alterations in original).  Such fraud must involve egregious conduct causing injury to more than a single litigant and must seriously affect the integrity of the judicial process.  *See* 12 James Wm. Moore et al., *Moore's Federal Practice* § 60.21(4)(a) (3d ed. 2013).  "Examples are bribery of judges, employment of counsel to 'influence' the court, bribery of the jury, and the involvement of an attorney (an officer of the court) in the perpetration of fraud."  *Gifford,* 86 S.D. at 625, 200 N.W.2d at 384 (citation omitted).  With these standards in mind, we examine Jessica's two grounds for relief.

### A. Delinquent Child Support Forgiveness

[¶22.]     Jessica poses the question before us as "whether, as a matter of public policy, this State will permit the parties to engage in unenforceable, and potentially

---

4.     Jessica has not cited fraud in SDCL 15-6-60(b)(3) as the basis for her claim.

criminal, 'side agreements' to induce parents to terminate their parental rights and consent to adoption."[5] This side agreement, she contends, "infected" the termination proceedings constituting "egregious conduct involving corruption of the judicial process itself." Jessica characterizes this agreement — Jared's forgiveness of her past-due child support — as an exchange of monetary consideration for her consent to adoption in violation of SDCL 25-6-4.2.[6] She points to the letter from Attorney Siegel, in which he told her that if she decided not to terminate her parental rights, the parties would "simply go back to the original child support Order, and you will have to start paying child support to your girls." Indeed, in her email she said she would not appear at the termination hearing without written assurance that her past-due child support would be forgiven.

[¶23.] Jessica also contends that because the parties could not agree to forgive past-due child support without an order of approval from the circuit court, *see* SDCL 25-7A-17, the nondisclosure of the agreement to Judge Tiede constituted a "fraud upon the court" under SDCL 15-6-60(b). South Dakota law provides:

---

5. Jessica contends that deciding public policy is a question of law to be reviewed de novo. Ultimately, though, Rule 60(b) decisions, as explained above, are reviewed for abuse of discretion. *See* 1 Steven Alan Childress & Martha S. Davis, *Federal Standards of Review* § 5.12 n.3 (3d ed. 1999) (abuse of discretion review "even when a legal error at trial is alleged as the basis for relief from judgment").

6. SDCL 25-6-4.2 provides:

> Any person who offers, gives, or receives any money or other consideration or thing of value in connection with the placing of any child for adoption, or relating to the consent to adoption, or with the petition for adoption except such charges as are approved by the court and fees charged by agencies licensed pursuant to chapter 26-6, is guilty of a Class 6 felony.

> An agreement between parents or other responsible persons relieving a party of any duty of support or responsibility or purporting to settle past, present, or future support obligations as settlement or prepayment may not act to reduce or terminate any rights of the Department of Social Services or any support obligee to recover from parents or other responsible persons for support provided, unless the department or any support obligee has consented to the agreement in writing and the agreement has been approved by a court of competent jurisdiction.

SDCL 25-7A-17. This statute appears inapplicable here, however, since Jared has not sought to enforce Jessica's arrearage obligation. Jessica directs us to no authority to support her proposition that the failure to meet the requirements of SDCL 25-7A-17, standing alone, constitutes proof of fraud upon the court.

[¶24.]    From our review of the record, we cannot contradict Judge Caldwell's implicit finding that the forgiveness of the back child support was not monetary consideration for Jessica's consent to the adoption. *See* SDCL 25-6-4.2. Although Jessica testified that she was in dire financial straits and could not afford the child support when she agreed to terminate her parental rights, the agreement to forgive arrearages, Judge Caldwell held, "was not done for an improper motive or purpose[.]" In response to a question from Judge Caldwell, Jessica denied that she agreed to terminate her parental rights to "get out of" child support. Nonetheless, we must still determine whether the court erroneously ruled that the parties did not commit a fraud upon the court simply in failing to disclose and obtain judicial consent for the agreement to forgive the past-due child support.

[¶25.]    To set aside a judgment on the basis of fraud upon the court under SDCL 15-6-60(b), Jessica must show a class of fraud that defiled the court. *See Williams Servs. v. Sherman*, 492 N.W.2d 122, 126 (S.D. 1992) (quoting *Gifford*, 86

S.D. at 625, 200 N.W.2d at 384). No question this side agreement should have been disclosed. But there is no suggestion here that the parties engaged in "an unconscionable plan or scheme . . . designed to improperly influence the court in its decision[,]" or corrupt "the judicial process itself." *See Hrachovec,* 516 N.W.2d at 312 (citation omitted). It is quite doubtful that the court would have refused to proceed with the termination and adoption had Jared and Jessica made known the terms of their agreement. We conclude that Judge Caldwell did not err in concluding that there was no fraud upon the court and did not abuse her discretion in denying relief under SDCL 15-6-60(b) because of this undisclosed side agreement on child support.

### B. Promise of Post-Adoption Visitation

[¶26.]     Jessica seeks not simply to obtain visitation with her children; she seeks to set aside the termination and adoption on the ground that her (arguably unenforceable) agreement for continued contact was not divulged to Judge Tiede at the termination hearing. Being uninformed of any such agreement, Judge Tiede did not specifically question Jessica on this subject. Jessica testified before Judge Caldwell that she would not have agreed to terminate her parental rights had Judge Tiede asked her if she understood that the parties' visitation agreement was unenforceable and that she would have no right to visit or contact her children after terminating her parental rights.[7] Jessica maintains that by not mentioning the

---

7.     South Dakota law may nonetheless confer visitation rights in these circumstances. Neither side, however, raised the following statute, so we do not resolve the question here. SDCL 25-6-17 states in part:

(continued . . .)

-12-

visitation agreement at the hearing, the parties committed a fraud upon the court warranting relief under SDCL 15-6-60(b).

[¶27.]     Judge Caldwell found that Jessica understood *at the termination hearing* that she was relinquishing "all birth family rights, including the right to demand visitation." Ruling that "no promise of an express visitation schedule was made" to Jessica, Judge Caldwell instead concluded that "Jared and Amy informed Jessica that they hoped to have [Jessica] remain a part of the daughters' lives, but all decisions would be based on what was in the best interest of the girls as determined by Jared and Amy." Judge Caldwell saw Jessica's claims "regarding the terms of a purported agreement" as "not credible."

[¶28.]     Still, the record reveals that there were some express understandings. One of Attorney Seigel's letters to Jessica "outline[d] the terms of future visitation." He wrote: "Jared and Amy agree that some open communication needs to exist among the girls, you, and their birth grandparents for the girls' benefit." He went on, "Jared and Amy also agree to let you know about the activities and events going on in the girls' lives, and they will send pictures and information now and again to

_____

(. . . continued)

> The natural parents of an adopted child shall retain no rights or privileges to have visitation or other post-adoption contact with the child, *except in cases where a natural parent consents to the adoption of a child by the child's stepfather or stepmother who is the present spouse of the natural parent* or in cases of voluntary termination where there is a written pre-adoption agreement between the natural parent or parents and the adoptive parents.

(Emphasis added.) *See* 2013 S.D. Sess. Laws. ch. 119, § 20 (amending SDCL 25-6-17 in part).

keep you posted." And the letter allocated visitation for the grandparents for "one weekend in the summer."

[¶29.]     Vital to our review is an examination of the record at Judge Tiede's hearing. Before a court may allow a parent to voluntarily terminate parental rights, it must conduct a "full and complete inquiry" and "determine whether the [parent is] fully aware of the purpose of the proceedings and the consequences" of the decision. SDCL 25-5A-16. At the termination hearing, Judge Tiede asked Jessica why she wanted to terminate her rights. She said it was best for her girls because Jared and Amy had been their primary caretakers for years, and Amy had assumed a mother-like role for them. Judge Tiede determined that Jessica was college educated and was not forced or coerced into making her decision. He found Jessica to be articulate and believed her decision to be reasonable and informed. Then, in his written findings, he ruled that Jessica voluntarily consented to the termination of her rights.

[¶30.]     Few decisions can be more momentous than the choice to give up one's parental rights. Consequently, we have required strict compliance with statutes governing voluntary terminations. *T.M.B. & M.A.D.*, 416 N.W.2d at 262. Such compliance is necessary because an order terminating parental rights under SDCL chapter 25-5A is intended to be "conclusive and binding on all parties." SDCL 25-5A-19. It is incumbent upon judges presiding in voluntary termination proceedings to ensure that the parents are fully aware of the ramifications of their actions. Indeed, in certain circumstances, a judge must determine that parents voluntarily terminating their parental rights understand that "a partial or conditional

termination [is] unacceptable." *See In re J.M.J.* (*J.M.J. I*), 368 N.W.2d 602, 606 (S.D. 1985), *rev'd in In re J.M.J.* (*J.M.J. II*), 379 N.W.2d 816 (S.D. 1985).

[¶31.]    Judge Caldwell did not address whether Judge Tiede satisfied the statutory requirement of conducting a "full and complete inquiry." *See* SDCL 25-5A-16.  Rather, she found that there was "no evidence to contradict the oral findings and conclusions of Judge Tiede" that Jessica knew she was making a permanent decision.  Jessica was entitled to the procedural safeguards set out in SDCL chapter 25-5A before a court could declare that she was "fully aware of the purpose of the proceedings and the consequences of" her decision.  *See* SDCL 25-5A-16.  Judge Tiede conducted a full inquiry on Jessica's motivation for terminating her parental rights, including asking her about threats, but he did not inquire about promises. Thus, the record is unclear on whether Jessica understood, *at the termination hearing*, that by giving up her parental rights, any purported agreement to allow future contact or visitation might be unenforceable.

[¶32.]    Yet Judge Tiede did touch on the issue of visitation when he asked Jessica: "Have you given that consideration in terms of trying to continue to have contact with them, albeit, obviously in Texas, it would be limited?"  Jessica responded: "Yep.  Umm, yeah.  I mean, I have thought about it.  It's been in the back of my head now for the last year and a half this whole decision, and I honestly just feel like it's in the best interests of my girls.  Jared has given them - - and Amy, have given them a wonderful home here.  And while I have been a part of their life, I haven't been acting in a motherly capacity.  That's been Amy's job."  Judge Tiede's question was an opening for Jessica to mention the agreement, but she said nothing

about it. Preferably, a court presiding in a voluntary termination proceeding should ask, among other things, whether any promises have been made to the parent in connection with the termination of parental rights.[8] *See, e.g., In re D.L.S.,* 332 N.W.2d 293, 301-02 (Wis. 1983) (listing six factors for ascertaining whether a consent is voluntary and informed).

[¶33.]     Turning to the question of a remedy, the broad language of SDCL 15-6-60(b) grants courts "ample power to vacate judgments whenever such action is appropriate to accomplish justice." *Blare v. Blare,* 302 N.W.2d 787, 789 (S.D. 1981) (citation omitted). But this power should not be used to relieve those who have made "free, calculated and deliberate choices[.]" *Id.* As Judge Caldwell found, it was Jessica who "approached Jared and Amy Miller about voluntarily terminating her parental rights." Indeed, it was Jessica who proceeded without consulting a lawyer, and who waived the counseling required for parents planning to voluntarily terminate their parental rights. *See* SDCL 25-5A-22. And it was Jessica who never mentioned to Judge Tiede her visitation agreement when asked about future contact with her children.

---

8.     As part of a court's "full and complete inquiry" as required by SDCL 25-5A-16, to determine whether the parent or parents are "fully aware of the purpose of the proceedings and the consequences of their act[,]" we recommend that the court ascertain: (1) the extent of the parent's education, level of general comprehension, and physical health, including medication or drug involvement; (2) the parent's understanding of the nature of the proceedings and the consequences of termination, including the finality of the parent's decision and the court's termination order; (3) the parent's understanding of the right to retain counsel before proceeding further; (4) whether there have been promises, threats, force, or coercion to obtain the parent's consent; and (5) the parent's understanding of alternatives to voluntary termination of parental rights that may be available.

[¶34.]     Judge Caldwell found there was no evidence of "suppression of information from Judge Tiede" and no one asked Jessica "to misrepresent or conceal any information" from him.  In fact, Jessica testified before Judge Caldwell that, "I don't believe that any of us knew that it was deceitful," referring to the side agreements.  Jessica's counsel portrays Jessica's participation in the termination hearing as her "innocent failure to disclose the illegal side agreements." "Nondisclosure by a party is not enough to support a finding of fraud upon the court." *Williams Servs.*, 492 N.W.2d at 126; 11 Charles A. Wright, et al., *Federal Practice & Procedure* § 2870 (3d ed. 2013).  Thus, the question comes down to whether failure to inquire of Jessica concerning any promises — combined with the parties' silence on their post-adoption visitation agreement — constituted the type of circumstance such that a refusal to grant Rule 60(b) relief would be an abuse of discretion.

[¶35.]     Relief under SDCL 15-6-60(b) is extraordinary, warranted only in exceptional circumstances.  *Williams Servs.,* 492 N.W.2d at 125.  Did this "defile the court itself"?  *See Reaser,* 2004 S.D. 116, ¶ 19, 688 N.W.2d at 435 (citation omitted).[9]  Was this an "unconscionable plan or scheme . . . designed to improperly influence the court in its decision"?  *Gifford,* 86 S.D. at 625, 200 N.W.2d at 384

---

9.     Jessica contends that *Reaser* controls here.  Although there are parallels with *Reaser*, there are at least two salient reasons to distinguish it: (1) as the circuit court found, there was no "suppression" or intentional concealment of information here, unlike in *Reaser* where counsel (acting unethically) and the parties engaged in a deliberate deception by presenting the court with one agreement for the record and retaining a contradictory private agreement, the terms of which the court had earlier refused to accept; and (2) *Reaser* did not present an "intervening equity."

(citation omitted). Judge Caldwell thought not. Even if we were to retain some doubt on this point, certainly, judgments of adoption should be particularly sacrosanct: children and adoptive parents need and deserve permanence. SDCL 25-5A-19. Belated contests over the legitimacy of adoptions cannot but impair the wellbeing of children. In this regard, Judge Caldwell found an "intervening equity." She concluded that "it would be inequitable to undo Amy's adoption of the children, who now consider her their mother and call her, 'Mom.'"

[¶36.]    To be sure, these were troubling circumstances: on the one hand, undisclosed side agreements and unsettled arrangements for continued parent and grandparent contact; on the other hand, the children's need for stability and finality in a major decision affecting their lives. In balancing these conflicting equities, Judge Caldwell bowed to the best interests of the children. We cannot say this was an abuse of discretion.

[¶37.]    Affirmed.

[¶38.]    GILBERTSON, Chief Justice, and ZINTER, SEVERSON and WILBUR, Justices, concur.